STATE of Wisconsin, Plaintiff-Respondent,

v.

Dennis R. FOSNOW, Defendant-Appellant.†

Court of Appeals

*No. 00–0122. Submitted on briefs December 7, 2000.—Decided December 21, 2000.*

## 2001 WI App 2

(Also reported in 624 N.W.2d 883.)

†Petition to review denied.

700

On behalf of the defendant-appellant, the cause was submitted on the briefs of *David D. Cook,* Monroe.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James M. Freimuth,* assistant attorney general, and *James E. Doyle,* attorney general.

Before Vergeront, Roggensack and Deininger, JJ.

¶ 1. DEININGER, J. Dennis Fosnow appeals an order denying postconviction relief under WIS. STAT. § 974.06 (1997–98).[1] In September 1989, he was charged with various crimes including armed burglary, kidnapping, and sexual assault. Although Fosnow originally pleaded not guilty by reason of mental disease or defect to these charges, he withdrew the pleas after psychiatric evaluations did not support it. He then pleaded no contest to reduced charges. In December 1998, Fosnow moved to withdraw his no contest pleas based on "newly discovered evidence" that he suffered from Dissociative Identity Disorder (DID) at the time of the crimes. Because we conclude that Fosnow's new DID diagnosis does not constitute newly discovered evidence, we affirm the circuit court's order.

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

## BACKGROUND

¶ 2.   In September 1989, Fosnow pointed a sawed-off shotgun at occupants of a Grant County tavern. Next, he kidnapped a bartender "for insurance purposes" and took her to a home in rural Crawford County, which he entered without the owner's consent. Fosnow then battered and sexually assaulted the bartender. He subsequently shot himself in an unsuccessful suicide attempt.

¶ 3.   The State charged Fosnow with five crimes in Grant County and four in Crawford County arising from the incident. He entered pleas of not guilty and not guilty by reason of mental disease or defect to all charges, and the court ordered mental examinations pursuant to WIS. STAT. § 971.16 (1987–88). At least three psychiatrists examined Fosnow, and all concluded that he was not suffering from a mental disease or defect at the time of the offenses which would render him not responsible for his actions under WIS. STAT. § 971.15 (1987–88).[2] Fosnow informed two of the psychiatrists that he heard voices or had "imaginary

---

[2] Drs. David Van Dyke and Frederick Fosdal conducted psychiatric evaluations of Fosnow in 1989, and their reports are part of the appellate record. Dr. John Wilson apparently conducted a pretrial psychiatric examination of Fosnow for the Crawford County court, but his report is not part of the appellate record. During cross-examination of Fosnow's postconviction psychiatric expert, Dr. Arnesen, however, the State noted Dr. Wilson's opinion that Fosnow had an "Axis I adjustment reaction with depressed mood, alcohol dependence, history of poly substance abuse and Axis II primary diagnosis anti-social personality disorder." Also, Dr. Fosdal mentions in his report that a "Dr. Miller" was also appointed to evaluate Fosnow regarding the Grant County charges, but we have found no other references to Dr. Miller in the record.

friends." According to Fosnow, one of the psychiatrists, Dr. Wilson, rejected his explanation of "hearing voices," saying that "the devil made me do it defense went out in the 60s and he wasn't going to hear it." Another psychiatrist, Dr. Van Dyke, specifically addressed and rejected a diagnosis of DID for Fosnow.[3]

¶ 4. In January 1990, Fosnow entered a plea agreement under which all pending charges were consolidated in Grant County. Fosnow withdrew his pleas of not guilty and not guilty by reason of mental disease or defect "based on the reports by all psychiatrists." Pursuant to the agreement, he entered pleas of no contest to five of the nine charges: recklessly endangering safety, kidnapping, first-degree sexual assault, armed burglary, and possession of a short-barreled shotgun. The remaining four charges were dismissed. The court subsequently sentenced Fosnow to a cumulative term of sixty years imprisonment.

¶ 5. In December 1998, Fosnow filed a motion to withdraw his no contest pleas pursuant to WIS. STAT. § 974.06. He alleged that he had not knowingly and

---

[3] Dissociative Identity Disorder (DID) was previously known as Multiple Personality Disorder, or MPD. For clarity, we employ only the current term for the disorder, which has been described as follows:

> The essential feature of Dissociative Identity Disorder is the presence of two or more distinct identities or personality states (Criterion A) that recurrently take control of behavior (Criterion B). There is an inability to recall important personal information, the extent of which is too great to be explained by ordinary forgetfulness (Criterion C). The disturbance is not due to the direct physiological effects of a substance or a general medical condition (Criterion D).

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 300.14, at 484 (4th ed. 1994) (DSM-IV).

voluntarily entered his pleas because he was not aware that he had a mental illness at the time of the offense which rendered him not criminally responsible for his actions under WIS. STAT. § 971.15 (1987–88). The circuit court conducted a hearing regarding Fosnow's postconviction claim of "newly discovered evidence," that is, his newly diagnosed DID. At the postconviction hearing, Fosnow presented the testimony of Dr. Richard Arnesen, who was his treating psychiatrist in prison from 1992 to 1998. Dr. Arnesen testified that in 1995 he determined that Fosnow had DID at the time of the crimes, and that therefore he was not criminally responsible for them. The State countered with testimony from two of the psychiatrists who evaluated Fosnow shortly following the crimes in 1989.

¶ 6.   The circuit court denied Fosnow's request to withdraw his no contest pleas. The court reasoned that Dr. Arnesen's opinion that Fosnow had DID in 1989 was not credible because its premises were "faulty" and "not true." Fosnow appeals the court's order denying him relief.[4]

## ANALYSIS

■■■

¶ 7.   "After sentencing, a defendant who seeks to withdraw a guilty or no contest plea carries the heavy burden of establishing, by clear and convincing evidence, that withdrawal of the plea is necessary to correct a manifest injustice." *State v. McCallum,* 208 Wis. 2d 463, 473 ¶ 15, 561 N.W.2d 707 (1997); *State v.*

___

[4] The trial court also determined that Fosnow had not established grounds for re-sentencing because Fosnow, his counsel, and the court all knew of Fosnow's dissociative problems at the time of his plea and sentencing. Fosnow does not pursue this issue on appeal.

*Krieger*, 163 Wis. 2d 241, 249, 471 N.W.2d 599 (Ct. App. 1991). Plea withdrawal is committed to the trial court's discretion. *McCallum*, 208 Wis. 2d at 473 ¶ 15. A reviewing court will reverse the trial court only if it has erroneously exercised its discretion in denying a plea withdrawal request, and this may occur when a trial court's decision is based on an erroneous application of the law. *Id.*

¶ 8.  Fosnow argues that the new DID diagnosis constitutes "newly discovered evidence" entitling him to withdraw his no contest pleas.[5] We agree that "[n]ewly discovered evidence may be sufficient to establish that a manifest injustice has occurred." *Id.* at ¶ 16. This is so because of the requirement that all pleas be supported by evidence establishing a factual basis to support the plea, and because newly discovered facts "could establish that conduct originally admitted by the defendant did not constitute the offense charged." *Krieger*, 163 Wis. 2d at 255.

¶ 9.  Generally, in order to warrant plea withdrawal on the basis of newly discovered evidence a defendant must show by clear and convincing evidence that:

> (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative. If the defendant proves these four criteria by clear and convincing evidence, the circuit court must

---

[5] The State concedes that Fosnow's claim of "newly discovered evidence" raises a due process issue cognizable under WIS. STAT. § 974.06, and avoids any procedural bar under § 974.06(4).

> determine whether a reasonable probability exists
> that a different result would be reached in a trial.

*McCallum*, 208 Wis. 2d at 473 ¶ 16. Newly discovered evidence, however, does not include the "new appreciation of the importance of evidence previously known but not used." *State v. Bembenek*, 140 Wis. 2d 248, 256, 409 N.W.2d 432 (Ct. App. 1987) (citation omitted). The State maintains that Fosnow's new DID diagnosis falls into the latter category—that it can be properly viewed only as the newly discovered importance of evidence previously known or knowable by Fosnow and his trial counsel. We agree.

¶ 10. As we have noted, our overall task is to determine whether the trial court erroneously exercised its discretion in denying Fosnow's plea withdrawal request. The standard for reviewing a trial court's determination that a defendant has not presented "newly discovered evidence" is not as clearly established. This court has on at least one occasion determined it to be a question of law, subject to de novo review on appeal. *See State v. Jackson*, 188 Wis. 2d 187, 197, 525 N.W.2d 739 (Ct. App. 1994).[6] Chief Justice Abrahamson has suggested in a concurring opinion, however, that the first two elements of the *McCallum* test (whether evidence was discovered after conviction and whether the defendant was not negligent in seek-

[6] The issue in *State v. Jackson*, 188 Wis. 2d 187, 525 N.W.2d 739 (Ct. App. 1994) was whether a co-defendant's testimony, which was known but "unavailable" at the time of trial due to the co-defendant's invocation of the Fifth Amendment, constituted "newly discovered evidence." We cited *State v. Michels*, 150 Wis. 2d 94, 97, 441 N.W.2d 278 (Ct. App. 1989) as supporting de novo review, although we note that the question in *Michels* was whether a defendant had presented a "new factor" for sentence modification purposes.

ing evidence) are factual in nature and should be reviewed on the "clearly erroneous" standard; while the third and fourth elements (materiality and cumulativeness) are evidentiary rulings, reviewable for an erroneous exercise of discretion. *McCallum*, 208 Wis. 2d at 486 ¶¶ 43–44 (Abrahamson, C.J., concurring).

¶ 11.   Here, as Fosnow points out, the trial court did not separately address the first four *McCallum* factors, and it would thus be difficult for us to separately review the trial court's determinations regarding them for clear error or an erroneous exercise of discretion. The trial court simply noted in its written decision that "[i]f [Fosnow] had this [DID] disorder, an Axis I disorder, when he changed his plea in 1989, the court concludes he would be entitled to the relief of being allowed to withdraw his 1989 plea, since this would be newly discovered evidence since it was unknown in 1989." The court went on to conclude that Dr. Arnesen's opinion was not credible, which is a part of the final element in the *McCallum* analysis. We conclude, however, that our disposition of this appeal is not governed by a review of the trial court's application of the *McCallum* factors. We may nonetheless affirm the proper result the trial court reached, even if we do so for a different reason. *See State v. Holt*, 128 Wis. 2d 110, 124, 382 N.W.2d 679 (Ct. App. 1985).

¶ 12.   As we discuss below, we conclude that Dr. Arnesen's opinion and diagnosis were not "new evidence" at all, but merely "the newly discovered importance of existing evidence." *Krieger*, 163 Wis. 2d at 256. We further conclude that we may make this determination de novo, because it is in the nature of an exception to the application of the "newly discovered evidence" tests, and because it is a determination

which the trial court is no better positioned than a reviewing court to make. An item proffered postconviction may present an exception to the *McCallum* analysis when, even though it was "discovered" after conviction, the defendant was not negligent in not seeking it earlier, and it is arguably material and noncumulative, it is nonetheless not "newly discovered evidence," but something else. The determination of whether something proffered postconviction should be categorically excepted from being declared "newly discovered evidence" thus presents a question of law, requiring an assessment only of the nature of the proffered item, and not of the facts surrounding its discovery, the defendant's diligence, or the item's materiality to issues in the case.

¶ 13. Wisconsin courts have previously addressed the issue of whether a postconviction mental health diagnoses constitutes "newly discovered evidence." The defendant in *Vara v. State*, 56 Wis. 2d 390, 393–94, 202 N.W.2d 10 (1972), sought a new trial because he had sustained a brain injury prior to the homicide of which he was convicted, which, in combination with alcohol, "would be the basis of a defense of insanity or intoxication or the inability to form the specific intent required by first-degree murder." *Id.* at 393. The supreme court rejected the claim of newly discovered evidence, explaining:

> Vara and his attorney knew he had the head injury which formed the basis of the claim of insanity. This knowledge did not come after the trial but was known before the trial and therefore is no ground for the motion. . . . The claim is made the importance of the brain injury was not realized until after trial. But newly discovered evidence does not

include newly discovered importance of evidence previously known and not used.

*Id.* at 394 (citations omitted).

¶ 14. We reached a similar conclusion in a case whose procedural posture closely parallels that before us now. *See State v. Krieger*, 163 Wis. 2d 241, 471 N.W.2d 599 (Ct. App. 1991). Krieger sought to withdraw his no contest pleas to numerous charges involving the sexual assault and sexual exploitation of children on the basis of a postconviction expert opinion that he "suffers from pedophilia; that pedophilia is a mental disorder; and that, as a result, Krieger was not criminally responsible when he committed" the offenses to which he pled. *Id.* at 256.

¶ 15. We rejected the newly discovered evidence claim, noting that "voluminous evidence" of the defendant's mental health was available to counsel before sentencing. *Id.* Specifically, we pointed out that Krieger had completed a "seven-week intensive, inpatient treatment program at a psychiatric hospital," which yielded a "psychiatric and psychological assessment," concluding that he suffered "from depression and sexual addiction." *Id.* Despite this, "Krieger failed to obtain any diagnosis that his sexual addiction met the standards" for the lack of criminal responsibility under WIS. STAT. § 971.15. *Id.* We concluded:

> Krieger has failed to differentiate the voluminous psychiatric evidence available before sentencing from Berlin's [postconviction] opinion that Krieger met the standards of sec. 971.15(1), Stats., and was not responsible for his conduct occurring after sentencing. We conclude that Berlin's opinion was nothing more than the newly discovered importance of existing evidence and does not constitute "manifest injustice."

*Id.* (citing *Vara,* 56 Wis. 2d at 394).

¶ 16.   In both *Vara* and *Krieger,* evidence forming the basis for a possible defense of lack of criminal responsibility under WIS. STAT. § 971.15 (1987–88) existed and was available to the defendants or their counsel prior to conviction and sentencing. The same is true in this case. Evidence of Fosnow's dissociative personality features and other possible DID symptoms existed and was known to him and his counsel at the time he entered his pleas. We conclude that Dr. Arnesen's postconviction opinion that Fosnow suffered from DID at the time of the crimes and was thus not criminally responsible for them, is, like the postconviction opinions proffered in *Vara* and *Krieger,* simply "the newly discovered importance of existing evidence," rather than newly discovered evidence. *See Krieger,* 163 Wis. 2d at 256; *Vara,* 56 Wis. 2d at 394.

¶ 17.   Fosnow argues that his case is distinguishable from *Vara,* however, because he did attempt to raise a defense under WIS. STAT. § 971.15 (1987–88) before changing his pleas, and thus he is not guilty of "changing tactics" after conviction, as was the defendant in *Vara.* We reject this distinction. Although the supreme court noted that Vara had "effectively waived" a criminal non-responsibility defense by making the "tactical choice" to instead pursue a self-defense theory at trial, *see Vara,* 56 Wis. 2d at 393, the court also deemed Vara's failure to present "newly discovered evidence" a separate and sufficient ground for denying relief. *See id.* ("In addition, the evidence is not newly discovered . . . .").

¶ 18.   Fosnow's attempt to distinguish *Krieger* is equally unavailing. He claims that unlike that case, here "there was very little psychiatric evidence available at the time of the plea and prior to sentencing." We

disagree. Fosnow had a lengthy history of criminal activity (beginning as a juvenile) and psychiatric observation (beginning in approximately 1975) which he communicated to the examining psychiatrists in 1989. Fosnow provided the following information regarding his history of mental health treatment to Dr. Fosdal:

> First received mental health care after dropping out of high school [around 1975]—first at the Rock County Hospital for a couple of months—apparently under a Chapter 51 petition—around 1982—made a suicide attempt—was on antidepressants. . . . Continued under outpatient care for a short period of time. Next received outpatient care around 1984–85, in Prairie du Chien for about one year—was restarted on an antidepressant—Sinequan. Continued under outpatient care for about one year and had monthly visits with Dr. Kempten—this doctor has now moved out of state. Later was followed by Dr. Wienberg' from LaCrosse—had his visits at the Crawford County Mental Health Center. Was later sent to prison in Iowa and did not have any mental health care while in prison. While on parole, had one visit with Dr. Wilson in Prairie du Chien, but did not have any subsequent visits has not been on any psychiatric medications while on parole. Then said he was admitted to a mental health institute, around 1986, in Independence, Iowa . . . "because I started drinking again." Was hospitalized for about one month and participated in alcohol treatment program.

Dr. Van Dyke's 1989 report contains the following information regarding Fosnow's mental health history:

> There was also a previous incident in Iowa where he barricaded himself in an apartment, held the cops

711

off for several hours, and indicated that he was suicidal at that time. . . .

He also has other mental health history. He was committed to the Mental Health Institute in Independence, Iowa for thirty days. He described himself as being wild, carrying a gun, fighting, and suicidal. He was not treated with medication. He was in the Rock County Mental Health Center for 70 days. He was then on the antidepressant, Sinequan. He saw Dr. Kempton in 1984 for quite a period of time as an outpatient in Prairie du Chien and he was on medications. He states that throughout his life he has had many fights and he is much more likely to do so if he is on drugs or alcohol.

¶ 19.   Thus, Fosnow was very much aware of his own prior history of mental health treatment, and upon receiving the 1989 reports, if not before, so was his attorney. The record does not disclose whether Fosnow or his trial counsel attempted to obtain records of his prior mental health treatment, but it is reasonable to infer that such records existed and could have been obtained by Fosnow. Moreover, at least three psychiatric assessments were performed on Fosnow in 1989, all specifically relating to his criminal responsibility for the crimes at issue, and written reports of the evaluations were provided to counsel. Thus, we are satisfied that, like in *Krieger*, extensive "psychiatric evidence" was available to Fosnow prior to his plea and sentencing. *Krieger*, 163 Wis. 2d at 256.

¶ 20.   Fosnow also attempts to distinguish his situation from that in *Krieger* by asserting that (1) DID is a disorder that "cannot normally be accurately diagnosed with[in] the statutory time frame for [pretrial] psychiatric evaluations," and (2) "Dr. Arnesen's opinion was not based on an evaluation of evidence already

in existence at the time of the trial." We remain unpersuaded, however, that our conclusions in *Krieger* should not apply on the present facts.

¶ 21. According to the AMERICAN PSYCHIATRIC ASSOCIATION'S DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 300.14, at 486 (4th ed. 1994), DID "appears to have a fluctuating clinical course that tends to be chronic and recurrent. The average time period from first symptom presentation to diagnosis is 6–7 years." Here, Fosnow experienced possible DID symptoms (see footnote 3) for several years prior to the time of his psychiatric evaluations for these crimes. He told Dr. Van Dyke in 1989 that "when he begins feeling very angry or depressed, he is greatly influenced by a person that he describes as an imaginary friend," and that he had developed imaginary friends since childhood. Fosnow also related in 1989 how his imaginary friend, "Scarface," would influence him to do bad things, and that "he would stand by and watch as Scarface did those things." Based on this symptomology, Dr. Van Dyke noted that Fosnow "dissociates to a degree during some of his misbehavior," but rejected a DID diagnosis based on his other observations during two psychiatric interviews with Fosnow. We therefore reject the implication that a DID diagnosis *could* not have been made in 1989—it simply *was* not made at that time.

¶ 22. We further conclude that the three main factors contributing to Dr. Arnesen's postconviction DID diagnosis all existed, and that they were known or knowable at the time of the Fosnow's psychiatric evaluations in 1989. The first is the presence of alternate personalities. As we have noted, Fosnow described his "imaginary friends," dating back to his childhood, to Dr. Van Dyke. Fosnow also told Dr. Wilson in 1989 that

he blamed the crimes on hearing "voices." More specifically, he told Dr. Van Dyke that Scarface was with him and goading him into the crimes on the night in question. Thus, the presence or possibility of alternate personalities, particularly Scarface, was known at the time of the initial evaluations, notwithstanding the fact that the examining psychiatrists rejected a finding that Fosnow committed the crimes during a psychotic episode that would render him not criminally responsible for them.

¶ 23.   A second factor in Dr. Arnesen's DID diagnosis is Fosnow's alleged lack of memory regarding the crimes at issue. The parties dispute the extent, if any, of Fosnow's memory of the crimes. However, according to Drs. Van Dyke and Fosdal's psychiatric reports from 1989, Fosnow had memory of "some, *but not all* of what happened." (Emphasis added.) Some of the information that Fosnow could not remember included: returning home to retrieve the gun, backing into another car, going into the bar with the shotgun, and the entire drive out to Crawford County. His lack of memory of certain key events in 1989 is sufficient for us to conclude that Fosnow's memory lapses were not unknown prior to his pleas.[7]

¶ 24.   A third factor in Dr. Arnesen's DID diagnosis is traumatic childhood experiences. In at least one of the 1989 psychiatric evaluations, Fosnow revealed that he had been physically abused by his caregivers, including his grandmother and his stepfather. Moreover, at his sentencing, Fosnow told the court that "growing up I was physically and sexually abused by members of my family continuously." Thus, Fosnow's

---

[7] Dr. Arnesen also pointed to Fosnow's memory lapses since childhood. Again, these lapses were known or knowable at the time of the initial psychiatric evaluations.

traumatic childhood experiences too were known at the time of his initial evaluations.

¶ 25. In sum, the examining psychiatrists at the time of his pleas either were aware of or had available the information necessary to evaluate Fosnow's mental status at the time of the crimes.[8] Fosnow and his trial counsel were aware of a possible DID diagnosis from Dr. Van Dyke's report and did not choose to obtain additional evaluations that might have supported it in 1989. Another of the original examiners, Dr. Fosdal, explained at the postconviction hearing that Arnesen's "new" diagnosis of DID, even if true, does not necessarily invalidate the conclusions reached in the 1989 evaluations:

> It doesn't change my opinion. The issue that we described back in those days ten years ago was true. In other words, he did have a personality which has strong anti-social associations. He has been in a lot of trouble. He has a drinking history and drug abuse history, so those things are true, but the personality we are seeing now if later on in prison alternate selves become available, then this would be a supplemental diagnostic category. It doesn't change the

---

[8] At the time of the crimes and Fosnow's psychiatric evaluations in 1989, DID was a known disorder in the psychiatric field. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 300.14, at 477 (3d ed. 1980). Also, the courts experienced a significant increase in criminal dissociative disorder litigation in the 1980's. Sabra M. Owens, *The Multiple Personality Disorder (MPD) Defense*, 8 MD. J. CONTEMP. L. ISSUES 237, 244 (1997) (thirty-one such appellate cases in the 1980's). Contrast *Coogan v. McCaughtry*, 958 F.2d 793, 803 n.5 (7th Cir. 1992) (noting that post-traumatic stress disorder "was not as widely recognized then [1979] as it is now").

fact that he has had a drinking problem or that he has been anti-social for many years. That's still true, but if Dr. Arnesen's involvement raises the possibility of . . . his having [DID] on top of the previous diagnostic formulations, it doesn't replace them.

We conclude, therefore, that this new expert opinion is "nothing more than the newly discovered importance of existing evidence," *Krieger*, 163 Wis. 2d at 256, not newly discovered evidence for purposes of plea withdrawal.

¶ 26. We are not the only court to conclude, as we have both here and in *Krieger*, that new expert opinions obtained postconviction do not qualify as newly discovered evidence regarding a defendant's mental responsibility for a crime. The Minnesota Supreme Court, applying a standard for newly discovered evidence that is nearly identical to the *McCallum* formulation, concluded as follows:

> Dr. Vinnes' evidence is merely a different opinion from a different expert, based on a different test which measures many of the same capacities as the other tests which were administered before trial. Generally expert testimony does not constitute newly discovered evidence justifying a new trial. . . . Nine medical experts gave testimony at appellant's trial; if the discovery of a tenth expert is new evidence warranting a new trial, no verdict would ever be final.

*State v. Blasus*, 445 N.W.2d 535, 543 (Minn. 1989) (citation omitted). Similarly, the Court of Appeals of Washington, in denying a new trial request based on a postconviction psychiatric opinion supporting a diminished capacity defense, concluded that a "new expert opinion, based on the facts available to the trial expert,

did not constitute 'newly discovered evidence' " under factors similar to the *McCallum* factors. *State v. Harper*, 823 P.2d 1137, 1143 (Wash. App. 1992). The Washington court adopted the following language from a concurring opinion in a prior case:

> [W]e must ask whether all of those defendants who could now unearth a new expert, who finds "new facts"—which if believed by the same jury might cause them to acquit—were denied a fair trial, i.e. failed to receive substantial justice. Surely we have to answer in the negative, or finality goes by the boards and the system fails.

*Id.* (citation omitted).

¶ 27.  We note also that the Wisconsin Supreme Court has expressed concern regarding the ability of litigants to procure testimony from psychiatric experts that is "tailor[ed] . . . to the particular client whom they represent." *Steele v. State*, 97 Wis. 2d 72, 97, 294 N.W.2d 2 (1980).[9] We emphasize that there is no indication in the present record that Fosnow or his postconviction counsel sought out Dr. Arnesen for the purpose of obtaining a specific diagnosis or a new opinion regarding Fosnow's criminal non-responsibility under WIS. STAT. § 971.15. To the contrary, Dr. Arnesen's diagnosis and opinion appears to have evolved during his treatment of Fosnow in prison.

---

[9] The issue in *Steele* was whether psychiatric testimony should be admitted in the guilt phase of a bifurcated criminal trial on the issue of whether the defendant had the capacity to form the specific intent specified for the crime. The court concluded that it should not be admitted for that purpose, noting that "[w]hile some courts may have blind faith in all phases of psychiatry, this court does not." *Steele v. State,* 97 Wis. 2d 72, 97, 294 N.W.2d 2 (1980).

Nonetheless, Arnesen's diagnosis remains "merely a different opinion from a different expert." *Blasus*, 445 N.W.2d at 543. Permitting Fosnow to withdraw his plea on the basis of the Arnesen diagnosis would establish a precedent for the "classic case" described by the Washington Court of Appeals: "the defendant loses, then hires a new lawyer, who hires a new expert, who examines the same evidence and produces a new opinion. We cannot accept this as a basis for a new trial." *Harper*, 823 P.2d at 1143 (citation omitted).

¶ 28. The State asserts that, even if the DID diagnosis constitutes "newly discovered evidence," there is no reasonable probability that the evidence would lead to a different result. The parties also dispute whether, if we were to permit Fosnow to withdraw his no contest pleas, he would be entitled to contest his factual guilt on the charges, or only his mental responsibility for them. Given our conclusion that the DID diagnosis is not newly discovered evidence, we need not address either issue.

## CONCLUSION

¶ 29. For the reasons discussed above, we affirm the appealed order.

*By the Court.*—Order affirmed.