COURT OF APPEALS
DECISION
DATED AND FILED

November 2, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP369**

STATE OF WISCONSIN

Cir. Ct. No. 2011CF1208

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

EDWARD S. KUCHINSKAS,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: FREDERICK C. ROSA, Judge. *Affirmed*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Edward S. Kuchinskas appeals from an order of the circuit court denying his motion to vacate his conviction and grant him a new trial.  Kuchinskas asserts that the report and opinions of Dr. Michael Weinraub attached to his motion constitute newly discovered evidence.  We conclude that they do not.  Dr. Weinraub's report and opinions do not show that there has been a shift in mainstream medical opinion regarding the issue of whether short falls can cause brain injuries in infants and toddlers.

¶2    We further conclude that Dr. Weinraub's opinions that injuries to an infant or toddler's head may result from a short fall involving occipital—back of the head—impact are not relevant to this case because in his report, Dr. Weinraub acknowledges that the record shows there was no occipital impact in this case.  In his report, he describes the falling incident as follows:  "[Oliver] fell on the ground first onto a thick carpeted floor, landing on his right side, then rolled over onto his back and then [Kuchinskas] fell landing with his hand on [Oliver]."[1]  Dr. Weinraub's reference to occipital impact in this case is not consistent with the facts in the record and, thus, renders his opinions speculative and not relevant to this case.

¶3    We also conclude that Dr. Weinraub's report and opinion are merely a challenge to Dr. Angela Rabbitt's—a pediatric child abuse specialist—opinions in the nature of a *Daubert* challenge that should have been brought at the time of trial.[2]  Dr. Weinraub's report discusses evidence that he believes should have been

---

[1]  For ease of reading and to protect confidentiality, we use a pseudonym when referring to the child victim in this case.

[2]  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

introduced during trial. Dr. Weinraub also opines that opinions by other experts, such as a radiologist and an ophthalmologist, are necessary to determine the causes of Oliver's injuries. First, Dr. Weinraub does not opine that opinions from those experts could not have been obtained at the time of the trial. Second, Kuchinskas has not submitted any reports from those experts. Therefore, if opinions from those experts are necessary to determine the cause of Oliver's injuries, any opinion by Dr. Weinraub regarding the cause of Oliver's injuries is speculative.

¶4    Thus, we conclude that Kuchinskas has not presented newly discovered evidence, and we affirm the circuit court's order denying Kuchinskas's motion without a hearing.

## BACKGROUND

¶5    In a previous decision in which we addressed Kuchinskas's first appeal, we described the facts of this case as follows:

> [Oliver] was born to [Erin] Sabady and Kuchinskas on May 2, 2010. After a month-long hospital stay, [Oliver] went home with his parents to the trailer they shared with Kuchinskas's grandmother, Beverly Kehoss. Early in the morning of July 10, 2010, Sabady called 911 seeking help for [Oliver]. At the hospital, medical personnel determined that [Oliver] had recent fractures to nearly all of his ribs and had sustained two liver lacerations. He also had a bruised brain, a fractured skull, subdural hemorrhages— bleeding between the brain and skull—in both the front and the back of his head, extensive retinal hemorrhages, and optic nerve damage leading to blindness in his right eye.

*State v. Kuchinskas*, No. 2013AP1100-CR, unpublished slip op. ¶2 (WI App Jan. 13, 2015).

3

¶6    Kuchinskas was tried before a jury in August 2011.  At trial, Sabady and Kehoss testified that they took Oliver shopping on the evening of July 9, 2010, and Oliver appeared normal at that time.[3]  Sabady further testified that Oliver had not been sleeping well for approximately the last three nights before July 9, and was again not sleeping well on July 9 after the shopping trip, so around 2:00 or 3:00 a.m., Kuchinskas offered to take responsibility for Oliver to let Sabady get some sleep.  A neighbor, Gilbert Scherer, testified that he saw Kuchinskas with Oliver on multiple occasions throughout the night, that Oliver was screaming, and that Oliver's screaming was so disturbing and unusual to Scherer that he left to go sleep somewhere else.  On cross-examination, however, he confirmed that he "didn't see anything … dangerous going on" and he could "only testify to what [he] heard."  Sabady testified that when she awoke around 5:00 a.m., she saw Kuchinskas and Oliver sleeping together on a bed in the living area.  Further, Sabady and Steven Stessl, a friend who was also living in the trailer at the time, each testified that the alarm on the heart monitor Oliver wore was sounding shortly after 6:00 a.m.[4]  Kehoss, Sabady, and Stessl also each testified that Oliver did not look normal shortly thereafter and Oliver appeared to be having trouble breathing, which prompted Sabady to call 911.  According to Kehoss, Sabady, and Stessl, Kuchinskas did not want to call 911 because he was afraid that "they're

---

[3] Kehoss testified that Oliver was "whimpering" during the shopping trip, but she said that was normal for Oliver because "you have to understand [Oliver] was a very fragile baby" and "he cried a lot."

[4] Oliver wore a heart monitor because of health issues he experienced from the time of his birth, as a result of being born addicted to heroin.  Sabady and Stessl testified that Kuchinskas and Oliver were sleeping together on a bed in the living area when the alarm on the monitor began to sound.  Sabady and Stessl further testified that a cord on the monitor was unplugged, causing the alarm to go off.  Sabady testified that the alarm stopped after the monitor was plugged back in and she then tried to put Oliver back to sleep in his bassinette.

going to take [Oliver]" because "we're drug addicts." When the paramedics arrived, Kuchinskas was in Kehoss's bedroom with the door closed.

¶7 The State also presented the expert testimony of Dr. Rabbitt. Dr. Rabbitt had examined and treated Oliver after he was taken to the hospital, and she testified regarding the nature of Oliver's injuries and her opinion that Oliver's injuries were the result of abuse.

¶8 Sabady, Kehoss, and Detective Steven Fabry, an officer who interviewed Kuchinskas, testified that Kuchinskas explained to them that he fell on top of Oliver the morning of July 10, after becoming entangled in the cords of Oliver's heart monitor. Thus, Kuchinskas's theory of defense was that Kuchinskas did not intentionally cause any injuries to Oliver and that, if there was in fact abuse happening, someone else was ultimately responsible for it.

¶9 The jury found Kuchinskas guilty of two counts of child abuse and one count of child neglect.[5] He was sentenced on October 20, 2011, to thirty-six years of imprisonment, composed of twenty-five years of initial confinement and eleven years of extended supervision.

¶10 Kuchinskas filed a postconviction motion arguing that the trial court violated his right to present a defense when it excluded evidence of Sabady's drug use,[6] and that his trial counsel was ineffective because the trial presented several

---

[5] The Honorable Ellen R. Brostrom presided over Kuchinskas's trial, sentencing, and first postconviction motion. We refer to Judge Brostrom as the trial court. The Honorable Frederick C. Rosa presided over Kuchinskas's motion that underlies this appeal. We refer to Judge Rosa as the circuit court.

[6] Throughout the trial Kuchinskas tried to present evidence that Sabady used heroin and Oliver was born addicted to drugs, but the trial court rejected his efforts.

opportunities to offer testimony about Sabady's drug use that trial counsel failed to pursue. The trial court denied the motion, and we affirmed. *Kuchinskas*, No. 2013AP1100-CR, ¶1. Our supreme court denied review.

¶11 On July 22, 2019, Kuchinskas filed the motion for a new trial that underlies this appeal. In his motion, Kuchinskas argued that "advances in forensic pediatric science since his trial in 2011 raise significant questions regarding the accuracy of the [S]tate's expert testimony as to the cause of the injuries Kuchinskas was convicted of inflicting upon [Oliver]" and that these advances are newly discovered evidence warranting a new trial. In support of his motion, Kuchinskas attached a report from Dr. Michael Weinraub in which Dr. Weinraub opines that advances in medical science since Kuchinskas's trial indicate that Oliver's injuries may have been the result of the fall described by Kuchinskas.

¶12 The circuit court denied Kuchinskas's motion without a hearing. In its written decision, the circuit court pointed to the overwhelming evidence that the State presented at trial that Kuchinskas was the person who had injured Oliver:

> Kuchinskas's grandmother testified that [Oliver] appeared normal during [a] shopping trip late in the evening of July 9, 2010. Scherer saw Kuchinskas alone with [Oliver] on several occasions during the night of July 9, 2010, and heard the infant screaming in a terrible and unusual way. A police officer described Kuchinskas's statements about his actions on the night of July 9, 2010, which included admissions that Kuchinskas was responsible for [Oliver]'s care that night, that Kuchinskas fell on top of [Oliver], and that [Oliver] may have struck his head against a chair during the fall. Several witnesses testified that Kuchinskas did not want to call 911 because he feared that police would blame him for hurting [Oliver], and that he hid when paramedics arrived.... Dr. Rabbit[t] testified that when [Oliver] arrived at the hospital on July 10, 2010, he had recently received life-threatening injuries and that eye injuries are normally noticeable immediately after they occur. In light of this evidence, we are satisfied beyond a reasonable doubt that a rational jury would have delivered

> precisely the same guilty verdicts in this case had the jury also heard evidence that [Oliver] was born addicted to heroin and that [Sabady] "used drugs."

The circuit court then denied Kuchinskas's motion because he had not presented newly discovered evidence, and there was no reasonable probability of a different outcome "[g]iven the *particular factual circumstances* of this case, *including the defendant's varied statements* about Oliver's injuries and his different versions as to what had occurred." This appeal follows.

## DISCUSSION

¶13 A defendant is not automatically entitled to an evidentiary hearing following a postconviction motion. "A hearing on a postconviction motion is required only when the movant states sufficient material facts that, if true, would entitle the defendant to relief." *See* **State v. Allen**, 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433. "[I]f the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief," a circuit court may deny a postconviction motion without a hearing. *See* **id.**, ¶9. Whether a motion alleges sufficient facts that, if true, would entitle the defendant to an evidentiary hearing presents a question of law that we review *de novo*. *See* **State v. Bentley**, 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996).

¶14 In this case, Kuchinskas argues that he is entitled to a hearing on his motion for a new trial, alleging that he has newly discovered evidence. The decision to grant a motion for a new trial based on newly discovered evidence is committed to the circuit court's discretion. **State v. Avery**, 2013 WI 13, ¶22, 345 Wis. 2d 407, 826 N.W.2d 60. To be entitled to a new trial based on newly discovered evidence "a defendant must prove: '(1) the evidence was discovered

7

after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative.'" *State v. Plude*, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (citation omitted). "If the defendant is able to prove all four of these criteria, then it must be determined whether a reasonable probability exists that had the jury heard the newly[]discovered evidence, it would have had a reasonable doubt as to the defendant's guilt." *Id.*

¶15     "A reasonable probability of a different result exists if there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt." *Avery*, 345 Wis. 2d 407, ¶25. "A court reviewing the newly discovered evidence should consider whether a jury would find that the evidence 'had a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt as to the defendant's guilt.'" *Id.* (citation omitted). "This latter determination is a question of law." *See Plude*, 310 Wis. 2d 28, ¶33.

¶16     Relying on *State v. Edmunds*, 2008 WI App 33, 308 Wis. 2d 374, 746 N.W.2d 590,[7] Kuchinskas argues that the medical community has had a shift

---

[7] In *State v. Edmunds*, this court noted that

> Edmunds presented evidence that was not discovered until after her conviction, in the form of expert medical testimony, that a significant and legitimate debate in the medical community has developed in the past ten years over whether infants can be fatally injured through shaking alone … and whether other causes may mimic the symptoms traditionally viewed as indicating shaken baby or shaken impact syndrome.

*Id.*, 2008 WI App 33, ¶15, 308 Wis. 2d 374, 746 N.W.2d 590. It then stated that "[t]he newly discovered evidence in this case shows that there has been a shift in mainstream medical opinion since the time of Edmunds's trial as to the causes of the types of trauma [the child] exhibited." *Id.*, ¶23.

in the mainstream medical opinion regarding the seriousness of the injuries that can result from an accidental short fall involving an infant or a toddler, and the medical community now recognizes the risk of serious injury, and even death, that can result from an accidental short fall involving an infant or toddler. In other words, Kuchinskas argues that the medical community now recognizes that the severity of a head injury in an infant or toddler is not necessarily indicative of abuse, and the medical community now recognizes that the injuries sustained by Oliver could have been caused by the fall he described. He further argues that this shift renders Dr. Rabbitt's trial testimony that Oliver's injuries resulted from abuse as "no longer well-accepted in the medical community." We are not persuaded that any such shift in mainstream medical opinion exists and, therefore, Kuchinskas has failed to provide newly discovered evidence.

¶17 In particular, Kuchinskas provides four articles to demonstrate that there has been a shift in mainstream medical opinion since the time of his trial.[8] Three of the four articles, however, existed at the time of Kuchinskas's trial, and information of the nature contained in these articles was even relied on by Dr. Rabbitt, as evidenced by her testimony during the *Daubert* hearing. At the very beginning, Dr. Rabbit testified at the *Daubert* hearing that her opinion was based on "medical literature" consisting of "multiple studies out there looking at injuries that are sustained from short falls versus those that are sustained from

---

[8] Attached to an affidavit, Kuchinskas provided the following four articles relied on by Dr. Weinraub in forming his opinion: (1) Barry Wilkins & Robert Sunderland, *Head Injury—Abuse or Accident?*, 76 Archives of Disease in Childhood 393 (1997); (2) David L. Chadwick et al., *Annual Risk of Death Resulting from Short Falls Among Young Children: Less Than 1 in 1 Million*, 121 Pediatrics 1213 (2008); (3) Richard A. Greenberg et al., *Infant Carrier-Related Falls: An Unrecognized Danger*, 25 Pediatric Emergency Care 66 (2009); and (4) Jonathon Hughes et al., *Biomechanical Characteristics of Head Injuries from Falls in Children Younger than 48 Months*, 101 Archives of Disease in Childhood 310 (2016).

abusive head trauma and more severe injuries like a motor vehicle collision and a long fall out a window." She even acknowledged that, based on the medical literature existing at the time, Oliver's injuries could have resulted from an accidental short fall, but it was the presence and type of injuries in total that led her to her conclusion that Oliver suffered from abuse. Thus, it was not that the medical literature existing at the time of Kuchinskas's trial failed to recognize that an accidental short fall could result in severe injuries, but rather the presence of so many minor and severe injuries in Oliver's case, that led Dr. Rabbitt to conclude that Oliver suffered from abuse.

¶18     The fourth article provided by Kuchinskas is admittedly dated after Kuchinskas's trial because it was originally published in 2015, but examination of the contents of the four articles collectively shows that the 2015 article does not represent any such shift in mainstream medical opinion, and the debate in the medical community continues over the seriousness of the injuries that can result from an accidental short fall and the ability to predict abuse from a severe head injury, just the same as it did at the time of Kuchinskas's trial.

¶19     The first article provided by Kuchinskas is from 1997. It addresses the possibility of serious injury that can occur in infants and toddlers from short falls and recognizes that differing opinions exist in the medical community regarding whether the seriousness of the injuries to an infant or toddler indicate an accident or abuse. While the overall conclusion indicates that "[s]mall infants rarely sustain serious injury from accidents in the home," the article still recognizes that there are "widely divergent medical opinions" on this topic and "although there is an increasingly prevalent opinion that short falls never can cause serious injury, this, too, is still open to debate." The article further states in its conclusion that "[i]n the absence of clear signs of abuse we cannot jump to the

10

conclusion that injury is non-accidental just because there is brain injury or subdural hemorrhage."

¶20   Kuchinskas then provides an article from 2008 that considered the likelihood of death in infants and toddlers as a result of short falls and indicates that the risk of death—not serious injury—is "rare."  The article, though, still leaves open the possibility that serious injuries can result from short falls by recognizing that the medical community is still working to understand the injuries that can result from them.

¶21   Kuchinskas also presents an article from 2009 that he characterizes as marking the beginning of when the medical community started to recognize the serious risk of injury from short falls.  In this article, the injuries that could result from falls involving infant car seats being used as carriers were examined, and the article indicated that the medical community recognizes that there was a risk of serious injury resulting from short falls.  In fact, the article concluded that falls from infant car seats used as carriers "represent a significant source of morbidity." However, this does not mark the medical community's first recognition of the risk of serious injury from a short fall because this risk was noted in the 1997 article, where the article states that this risk was open to debate in the medical community.

¶22   The last article provided by Kuchinskas, as noted, is from 2015, and analyzes the resulting head injury from a fall based on different factors, such as the height of the fall and the surface upon which the infant fell.  It begins by recognizing that "[h]ead-injury severity and its relationship to fall height are extensively debated within the scientific literature."  The article then concludes that the resulting head injury is significantly impacted by the height of the fall, the area of the head impacted (particularly the parietal/temporal and occipital areas),

11

and the surface upon which the child fell. Thus, the article indicates that the nature of the fall must be considered when determining if abuse is or is not involved.

¶23 In light of the ongoing recognition in the previous three articles that serious injuries can result from short falls and that head injuries by themselves are not conclusively suggestive of abuse, the 2015 article represents no such mainstream shift in medical opinion. Furthermore, Dr. Weinraub even concedes in his report that

> [t]here was medical literature at the time of the trial which supports the idea that some infants and toddlers can suffer serious injuries from accidental short falls. This especially applies to complex short falls … with the infant in the stroller or car seat, and falls where both the infant and the adult fall together[.]

¶24 We are likewise not persuaded that the 2015 article creates a new standard of care workup different from the care workup Dr. Rabbitt did of Oliver at the hospital. Rather, the articles collectively show that the debate over the seriousness of injuries resulting from short falls and their ability to predict abuse existed then the same as it does now, and the articles show that the medical community has always considered that the injuries that can result from short falls are complex and require the examination of several factors, just as Dr. Rabbitt opined at the ***Daubert*** hearing and at trial. There is no new standard of care workup that Dr. Rabbitt needed to undertake of Oliver's injuries.

¶25 Further, as the State contends, there is a 2018 medical "Consensus Statement" that provides continued validity to Dr. Rabbitt's opinion.[9] This 2018

---

[9] *Consensus Statement on Abusive Head Trauma in Infants and Young Children*, 48 Pediatric Radiology 1048 (2018).

Consensus Statement was supported by the Society for Pediatric Radiology, American Society of Pediatric Neuroradiology, American Academy of Pediatrics, American Professional Society on the Abuse of Children, and others. It endorses an abusive head trauma diagnosis and states that the diagnosis is a multidisciplinary diagnosis that requires examining patient history, a physical examination, imaging, and laboratory findings. Thus, the medical consensus statement reaffirms Dr. Rabbitt's method for reaching the abusive head trauma diagnosis that she made with Oliver, during which she considered the number and types of injuries sustained by Oliver, consulted several medical professionals, and evaluated Oliver's injuries as a whole to determine the likelihood of abuse. Furthermore, we note that the 2018 Consensus Statement relies, in part, on the 2008 article provided by Kuchinskas. Thus, we are not persuaded that there is a shift in mainstream medical opinion that requires us to conclude that Kuchinskas has presented newly discovered evidence.

¶26    We further agree with the State that Dr. Weinraub's opinions are not relevant to this case as they are based, in part, on his assessment in his report that Oliver sustained an impact to the occipital area—backof his head. Indeed, despite Dr. Weinraub's description of an occipital impact in his report, Dr. Weinraub describes the falling incident as follows: "[Oliver] fell on the ground first onto a thick carpeted floor, landing on his right side, then rolled over onto his back and then [Kuchinskas] fell landing with his hand on [Oliver]." There was, therefore, no occipital impact based on the fall description provided by Kuchinskas, and any impact to Oliver's head was on the side, or temporal, areas onto a thick carpeted floor. Dr. Weinraub's references to occipital impact in this case are not consistent with the facts in the record and, thus, renders his opinions not relevant to this case.

¶27    We also conclude that Dr. Weinraub's opinions and report are merely a challenge to Dr. Rabbitt's opinions in the nature of a *Daubert* challenge that should have been brought at the time of trial.  In his report, Dr. Weinraub discusses evidence that he believes should have been introduced during trial.  All of this evidence relied on by Dr. Weinraub, however, existed at the time of the trial.  It is not new, and instead it is "merely a different opinion from a different expert." *See State v. Fosnow*, 2001 WI App 2, ¶27, 240 Wis. 2d 699, 624 N.W.2d 883 (citation omitted).  As such, it fails to meet the criteria for newly discovered evidence.

¶28    Dr. Weinraub also opines that opinions from additional experts, such as a radiologist and an ophthalmologist, were necessary to determine the causes of Oliver's injuries, and as a result, Dr. Weinraub does not actually provide an alternative diagnosis to refute the diagnosis provided by Dr. Rabbitt.  Yet, despite his opinion that additional experts were required, Dr. Weinraub does not assert that the opinions from these additional experts could not have been obtained at the time of trial nor does he explain how these additional opinions would have anything new to add in determining the cause of Oliver's injuries and resulting diagnosis.  Dr. Weinraub's report also fails to recognize that Dr. Rabbitt had obtained opinions from additional experts, such as an ophthalmologist and radiologist, at the time she was examining and treating Oliver at the hospital.  Therefore, any opinion by Dr. Weinraub regarding the cause of Oliver's injuries is speculative in nature and cannot be considered material or new.

¶29    Kuchinskas's failure to demonstrate that he has presented newly discovered evidence is fatal to his claim.  *See Plude*, 310 Wis. 2d 28, ¶32 (stating that a court only reaches the issue of whether there is a reasonable probability that a jury hearing both the old and the new evidence would have a doubt as to the

defendant's guilt, if the defendant is able to prove the four criteria to establish that he has newly discovered evidence). Nevertheless, for the sake of completeness, we address Kuchinskas's argument that Dr. Weinraub's opinion creates a reasonable probability that the jury would have a reasonable doubt as to Kuchinskas's guilt. Here, he argues that a jury hearing both the old and new evidence would have a reasonable doubt as to his guilt because Dr. Weinraub's opinion has the two-fold effect of discrediting Dr. Rabbitt and of providing support to his own version of events.[10] We disagree.

¶30    At trial, the jury heard testimony from several witnesses who observed Oliver in the days leading up to his admission to the hospital on July 10, 2010, and who were present at the time that Sabady called 911. The testimony from each witness was consistent that Oliver appeared normal the evening of July 9, that Kuchinskas took primary responsibility for Oliver's care during the night of July 9 into the morning of July 10, and that Oliver did not appear normal on the morning of July 10 and was having trouble breathing.

¶31    The jury also heard testimony from Dr. Rabbitt regarding the extent of Oliver's injuries and her opinion that Oliver's injuries were the result of abuse. It heard that at the hospital, medical personnel determined that Oliver had recent fractures to nearly all of his ribs and had sustained two liver lacerations. He also had a bruised brain, a fractured skull, subdural hemorrhages—bleeding between the brain and skull—in both the front and the back of his head, extensive retinal

---

[10] Kuchinskas specifically argues that he was "branded" as a "liar" by Dr. Rabbitt's testimony. However, Kuchinskas did not testify, and the jury heard Kuchinskas's version of events solely through the testimony of others who described for the jury what Kuchinskas told them.

hemorrhages, and optic nerve damage leading to blindness in his right eye. The jury was also presented with several exhibits, including pictures of several bruises and blisters on Oliver that were taken during Oliver's exam at the hospital and a stipulation by the parties that blankets and towels that were collected from the trailer contained Oliver's blood.

¶32    In the face of this evidence, Dr. Weinraub's report and opinion does not create a reasonable probability that the jury would have a reasonable doubt as to Kuchinskas's guilt. In fact, the jury already heard much of what is contained in Dr. Weinraub's report and opinion during Dr. Rabbitt's testimony and still found Kuchinskas guilty.

¶33    In her testimony, Dr. Rabbitt indicated that she considered the possibility that Oliver's injuries were the result of an accident, and a short fall in particular. However, she testified that she dismissed that possibility because of the "injuries in total." She explained:

> There are multiple studies looking at severe injuries in children such as when involved in a motor vehicle collision; falls out of third-story windows, and even in those, children's retinal hemorrhages are rare and rarely form a pattern that we see with [Oliver].

¶34    Thus, when Dr. Rabbitt was questioned by the State regarding Kuchinskas's explanation of an accidental fall, Dr. Rabbitt testified that Oliver's injuries were not consistent with that explanation. She testified:

> Some of the injuries could be caused by a fall like that, but certainly, specifically the injury to the brain and the retinal hemorrhaging, the optic nerve injury, not consistent with that. The fall—some of the rib fractures may have been caused by a compression injury. There were specific injuries to the ribs that could not have been caused by that mechanism described, and those were the fractures that were located in the perispinal area of the ribs….

Rather, it was her opinion that the rib fractures in the perispinal area were indicative of "squeezing [the] rib cage" because of the fulcrum effect on the transverse process and, thus, were not consistent with Kuchinskas's fall explanation where he was said to have compressed Oliver's rib cage with his hand.

¶35 As to who may have inflicted the injuries, Dr. Rabbitt testified that Oliver's injuries were, for the most part, inflicted in the seven-to-ten day period leading up to his hospitalization. However, she testified that it was likely that the majority of Oliver's injuries had occurred the night of July 9 based on two main factors. First, she testified that Oliver was observed to be grunting on the morning of July 10, but had not been doing so before that. This, she explained, indicated to her that the rib injuries were likely caused the night of July 9 because otherwise Oliver's grunting, which was caused by his rib injuries, would have been noticed earlier than the morning of July 10. Second, she testified that the type of eye injuries that Oliver suffered usually appear immediately after they happen. Sabady testified that Oliver was responsive and looking at the lights when they went shopping, indicating to Dr. Rabbitt that Oliver had no eye injuries at the time of the shopping trip on July 9. However, by the morning of July 10, Oliver's eyes were fixed and not responsive. Thus, Dr. Rabbitt testified that Oliver's eye injuries happened sometime after the shopping trip.

¶36 Dr. Weinraub's report adds nothing to what the jury already heard from Dr. Rabbitt in which she considered and dismissed Kuchinskas's fall explanation, and even considered the possibility that Oliver's injuries were inflicted at a different time by someone other than Kuchinskas on the night of July 9. Indeed, Dr. Weinraub's report ultimately concludes nothing beyond what Dr. Rabbitt explained because Dr. Weinraub repeatedly states nothing more in his report than that Oliver's injuries "could" have been produced by a short fall

17

consistent with the type of fall Kuchinskas described. Further, Dr. Weinraub does not opine that the totality of Oliver's injuries taken together are consistent with a short fall and not abuse. Dr. Weinraub then adds that additional experts, such as an ophthalmologist and a radiologist, would need to be consulted to determine if Oliver's injuries were in fact caused by a short fall. Dr. Rabbitt testified to this very fact herself when she acknowledged that Oliver's injuries "could" have been caused by a short fall, but then she rejected that conclusion based on her consultation with various other doctors, such as an ophthalmologist and a radiologist, and also based on the totality of Oliver's injuries. Thus, we reject Kuchinskas's argument that there is a reasonable probability of a different result.

## CONCLUSION

¶37 In sum, we conclude that the record conclusively shows that Kuchinskas has not presented newly discovered evidence and is not entitled to a hearing on his motion. Kuchinskas has failed to establish a shift in mainstream medical opinion that would require us to conclude that he has presented newly discovered evidence. Dr. Weinraub's report is also speculative and not relevant as a result of its reliance on facts that are inconsistent with the record and the need for additional information from other experts. There is also no reasonable probability that a jury hearing both the old and new evidence would have a doubt as to Kuchinskas's guilt. Therefore, we affirm the circuit court's order denying Kuchinskas's motion without a hearing.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.