# COURT OF APPEALS
## DECISION
## DATED AND FILED

## November 10, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP155**

STATE OF WISCONSIN

Cir. Ct. No. 2007CF2381

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JENNIFER HANCOCK,

DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Dane County: DANIEL T. DILLON, Judge. *Affirmed*.

Before Fitzpatrick, Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jennifer Hancock appeals an order denying her postconviction motion for a new trial under WIS. STAT. § 974.06 (2019-20).[1] Hancock argues that she is entitled to a new trial on the basis of newly discovered evidence. She further argues that we should exercise our discretionary power of reversal to grant her a new trial in the interest of justice. We reject her arguments and affirm the circuit court order.

## BACKGROUND

¶2 This case began in 2007 when Hancock, a home-daycare provider, called 9-1-1 to report that L.,[2] a four-month-old infant in her care, was limp and unresponsive. L. was taken to the hospital, where he died four days later.

¶3 The State charged Hancock with one count of first-degree reckless homicide. The case proceeded to a seven-day trial, which was held in 2009. Most pertinent to this appeal, the State presented Dr. Michael Stier, the pathologist who conducted L.'s autopsy, and four other physicians who testified as medical experts. As discussed in more detail below, all five experts opined that L. died from an acute (*i.e.*, recent) traumatic brain injury, with Stier and three of the State's other experts specifically opining that the injury was nonaccidental—*i.e.*, the result of abuse. The defense presented its own expert witness—Dr. Ronald Uscinski, a neurosurgeon—who opined that L.'s death was caused by

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Although WIS. STAT. § 809.86(3) permits us to use a deceased victim's name, we use only his first initial to respect the family's privacy.

nontraumatic "re-bleeding" of an older injury (namely, "chronic subdural hematomas") that had developed as a result of birth trauma.

¶4     In addition, Hancock testified at trial to the following. On the morning of the day that L. was hospitalized, he was behaving and eating normally. Mid-way through the morning, Hancock heard L. crying, and she observed a three-year-old child she was caring for lifting herself off L. Hancock calmed L. down, fed him, and put him down for a nap. When she later checked on L., she found him unresponsive and called 9-1-1.

¶5     The jury returned a guilty verdict and the court sentenced Hancock to a twenty-year bifurcated sentence, consisting of thirteen years of initial confinement and seven years of extended supervision. Hancock appealed, raising issues not germane to the present appeal, and this court affirmed. *See State v. Hancock*, No. 2011AP1559-CR, unpublished slip op. ¶¶1, 6 (WI App July 26, 2012).

¶6     In 2019, approximately ten years after her conviction, Hancock filed the instant motion for a new trial, pursuant to WIS. STAT. § 974.06. Hancock argued (as she does on appeal) that she was entitled to a new trial on two grounds: (1) newly discovered evidence because Stier had modified his conclusions on the cause of L.'s injuries and death, and (2) in the interest of justice.[3] The circuit

---

[3] Hancock also argued that she received ineffective assistance of trial and appellate counsel, and that the circuit court provided improper jury instructions. Neither argument is renewed on appeal. As discussed below, although Hancock does not renew her ineffective assistance claim on appeal, she now attempts to rely on the alleged inadequacy of counsel to support her argument that a new trial should be granted in the interest of justice pursuant to WIS. STAT. § 752.35.

court held a seven-day postconviction hearing, at which Stier and numerous medical experts testified for the State and for the defense. The circuit court issued a written decision and order denying the motion. Pertinent here, the circuit court concluded that, even assuming Hancock had presented newly discovered evidence, there was no reasonable probability of a different result at a new trial. The circuit court further concluded that Hancock was not entitled to a new trial in the interest of justice.

¶7     Hancock appeals. We discuss additional facts, as relevant, below.

## DISCUSSION

### I. Newly Discovered Evidence.

*A. Principles of Law and Standards of Review.*

¶8     We begin our analysis by considering applicable principles of law and the standard of review regarding newly discovered evidence.

¶9     "If a judgment is to be set aside based on newly discovered evidence, the defendant must provide sufficient evident to establish that defendant's conviction is a manifest injustice." *State v. McAlister*, 2018 WI 34, ¶31, 380 Wis. 2d 684, 911 N.W.2d 77. A manifest injustice may be shown when a defendant establishes that newly discovered evidence warrants a new trial. *See State v. Plude*, 2008 WI 58, ¶33, 310 Wis. 2d 28, 750 N.W.2d 42. "In a motion for a new trial based on newly discovered evidence, the defendant must prove, by clear and convincing evidence," that: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely

cumulative." *State v. Avery*, 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60 (internal quotation marks and quoted source omitted).

¶10 If a defendant is able to make these showings, then "'the circuit court must determine whether a reasonable probability exists that a different result would be reached in a trial.'" *Id.* (quoting *State v. McCallum*, 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997)). "A reasonable probability of a different result exists if there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt." *Avery*, 345 Wis. 2d 407, ¶25.

¶11 The parties appear to agree that the decision to grant or deny a motion for a new trial based on newly discovered evidence is discretionary, meaning that we review the circuit court's decision for an erroneous exercise of discretion. However, the parties do not address an apparent inconsistency in Wisconsin appellate case law regarding the specific standard for reviewing the circuit court's reasonable probability determination for newly discovered evidence. Some cases state that this determination is a question of law that we review de novo. *See, e.g.*, *Plude*, 310 Wis. 2d 28, ¶33 (it "is a question of law" "whether a jury would find that the newly-discovered evidence had [such] a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt as to the defendant's guilt"); *McAlister*, 380 Wis. 2d 684, ¶36 ("whether a jury considering the old and new evidence would have a reasonable doubt as to [the defendant's] guilt" is a "legal determination"). However, other cases indicate that we review this determination for an erroneous exercise of discretion. *See e.g.*, *State v. Avery*, 345 Wis. 2d 407, ¶32 ("When weighing the new evidence against the evidence presented at trial, we cannot say that the circuit court erroneously exercised its discretion when it concluded that the

photogrammetry evidence would not create a reasonable doubt in the minds of the jury." (emphasis omitted)); *State v. Edmunds*, 2008 WI App 33, ¶¶8, 16, 308 Wis. 2d 374, 746 N.W.2d 590 (reviewing for an erroneous exercise of discretion the circuit court's determination of whether the defendant established a right to a new trial based on newly discovered evidence and appearing to apply that discretionary standard to the circuit court's specific determination that "there was not a reasonable probability a new result would be reached with a new trial"); *see also McCallum*, 208 Wis. 2d at 484-85 & n.5 (Abrahamson, C.J., concurring) (noting inconsistency in standard of review).

¶12 Because our doing so will be most favorable to Hancock, we will assume without deciding that this question is one of law. In conducting our independent analysis, we defer to the circuit court's factual findings unless those findings are clearly erroneous. *See State v. Terrance J.W.*, 202 Wis. 2d 496, 501, 550 N.W.2d 445 (Ct. App. 1996); WIS. STAT. § 805.17(2).

*B. The Parties Agree That Hancock's Claim Turns on Whether Stier's Revised Opinion Regarding L.'s Injuries and Cause of Death Creates a Reasonable Probability of a Different Result at Trial.*

¶13 Hancock's newly discovered evidence claim centers on the revised cause-of-death opinion[4] of Stier, the pathologist who performed L.'s autopsy. Hancock argues that Stier's revised opinion constitutes newly discovered evidence

---

[4] For ease of reading, when we use the terms "revised cause-of-death opinion" and "revised opinion," we are referring generally to Stier's postconviction hearing testimony revisiting or modifying his trial testimony on L.'s injuries and ultimate cause of death. Thus, these terms do not refer only to Stier's ultimate conclusions regarding L.'s cause of death but also refer to Stier's opinions with respect to L.'s injuries.

entitling her to a new trial.[5]  In making this argument, Hancock points to a variety

of legal errors that the circuit court purportedly made in denying her motion for a

new trial.  As a preliminary matter, we note that this court may affirm the circuit

court's decision on grounds different from those relied on by the circuit court,

***Vanstone v. Town of Delafield***, 191 Wis. 2d 586, 595, 530 N.W.2d 16 (Ct. App.

1995), and as already discussed, we analyze these legal issues de novo without

---

[5] In an introduction to her brief-in-chief, Hancock argues that "[t]he medical evidence at [her] trial would be fundamentally different if the trial occurred today" *both* because Stier changed his cause-of-death opinion *and* because "there is now twelve more years' worth of research and medical experience further calling into question, and shifting the consensus regarding, the diagnoses of abuse [that] the State offered at trial."  Thus, the introduction implies that a new and different "consensus" has emerged in the medical community regarding "the diagnoses of abuse [that] the State offered at trial" and that such "consensus" also constitutes newly discovered evidence.  However, in the argument section of her brief-in-chief, Hancock does *not* argue that a new medical consensus constitutes newly discovered evidence.  *See* WIS. STAT. RULE 809.19(1)(e) (requiring an argument section in the brief-in-chief, in which the appellant must set forth the arguments on each issue presented).  Rather, Hancock argues that the development of medical knowledge since the time of trial was one of the reasons why Stier changed his cause-of-death opinion and that Stier's new opinion is the newly discovered evidence.  Thus, reasonably construed, Hancock's argument section refers to certain evidence presented at the postconviction hearing—the testimony of additional medical experts on L.'s cause of death and medical articles published after trial—not to argue that this evidence itself is newly discovered but only to argue that this evidence corroborates Stier's revised opinion.  We also note that, in her reply brief, Hancock argues that "a jury at retrial would hear an entirely different case" because "Hancock's counsel would cross[-examine the State's expert trial witnesses] on both (a) the 'legitimate' and 'significant' controversy in the medical community over the validity of their opinions that existed in 2009, … and (b) the growing support in the medical literature published in the twelve years since trial that the science behind the State's experts' opinions is unreliable."  If, by this statement, Hancock means to argue that a post-trial controversy (or consensus) on infant abuse constitutes newly discovered evidence, she has not sufficiently presented this argument in her brief-in-chief.  Accordingly, we do not address it.  *See* ***Bilda v. County of Milwaukee***, 2006 WI App 57, ¶20 n.7, 292 Wis. 2d 212, 713 N.W.2d 661 ("It is a well-established rule that we do not consider arguments raised for the first time in a reply brief.").

Moreover, as we subsequently discuss in more detail, and as Hancock herself acknowledges, to the extent there is a debate in the medical community on the topic of "shaken baby syndrome," that debate clearly existed at the time of Hancock's trial.  Indeed, the seminal case acknowledging this controversy—***State v. Edmunds***, 2008 WI App 33, 308 Wis. 2d 374, 746 N.W.2d 590—was decided *before* Hancock's 2009 trial.

deference to the circuit court's conclusions.  Moreover, as we now explain, by virtue of various concessions by the State, we need not address the majority of these alleged errors because the disputed issues are actually few.

¶14     First, the State does not respond to Hancock's argument that Stier's revised cause-of-death opinion meets the first four criteria for a newly discovered evidence claim.  *See Avery*, 345 Wis. 2d 407, ¶25.  Thus, the State concedes that Hancock has established, by clear and convincing evidence that:  (1) Stier's revised cause-of-death opinion was discovered after Hancock's conviction; (2) Hancock was not negligent in learning of this evidence for the first time after her conviction; (3) the evidence is material to an issue in Hancock's case; and (4) the evidence is not merely cumulative.  *See id.*[6]

¶15     Second, Hancock argues that the circuit court erred in concluding that Stier's revised cause-of-death opinion was merely the newly discovered importance of existing evidence, pursuant to *State v. Fosnow*, 2001 WI App 2, ¶9, 240 Wis. 2d 699, 624 N.W.2d 883, and *State v. Williams*, 2001 WI App 155, ¶16, 246 Wis. 2d 722, 631 N.W.2d 623.  *See Williams*, 2001 WI App 155, ¶16 (citing *Fosnow* for the proposition that a new "appreciation" or a "reformulati[on]" of existing evidence by a new expert—*i.e.*, one who did not testify at trial—is not newly discovered evidence).  Hancock argues that neither *Fosnow* nor *Williams* applies because both cases involve newly discovered evidence claims based on a *new* expert's analysis of old facts and that neither case involves a trial witness whose expert opinion changed following the trial.  Hancock argues that, unlike in

_____

[6] The circuit court did not specifically address whether Hancock met these four criteria and Hancock does not allege any circuit court error with respect to them.  Here we simply note, for the sake of completeness, that the parties agree that these criteria are met.

*Fosnow* and *Williams*, in this case, Stier has revised his trial testimony based on new knowledge and experience gained after the trial, and that because an expert's opinions are evidence, the evidence itself has changed. The State does not respond to this argument, thereby conceding that Stier's revised opinion is conceptually distinct from a *new* expert's re-evaluation of facts available at trial, which *Fosnow* and *Williams* held does not constitute newly discovered evidence as a matter of law. *See Fosnow*, 240 Wis. 2d 699, ¶¶9, 12; *Williams*, 246 Wis. 2d 722, ¶¶12, 16.[7] Thus, we assume for purposes of this decision that *Fosnow* and *Williams* are distinguishable and that Stier's revised opinion constitutes newly discovered evidence.

¶16    Third, the State does not dispute that, to the extent that Stier's revised cause-of-death opinion constitutes a "recantation" of his trial testimony as Hancock argues, Hancock has met the *McCallum* standard for corroborating this recantation. *See McCallum*, 208 Wis. 2d at 477-78 (a recantation must be corroborated by "other newly discovered evidence;" the corroboration requirement is met where "(1) there is a feasible motive for the initial false statement; and, (2) there are circumstantial guarantees of the trustworthiness of the recantation"). Hancock argues that Stier had a feasible motive for his original opinions—namely, that he felt pressured by peers to find a skull fracture (and possibly abuse) and that he had gained additional experience in the decade since his trial testimony (in particular, his autopsy observations of nontraumatic acute subdural hemorrhages).

---

[7] Instead of responding to Hancock's argument as to how this case is distinguishable from *State v. Fosnow*, 2001 WI App 2, 240 Wis. 2d 699, 624 N.W.2d 883, and *State v. Williams*, 2001 WI App 155, 246 Wis. 2d 722, 631 N.W.2d 623, the State merely cites or quotes those cases.

She further argues that Stier's revised opinion was trustworthy because it was testified to under oath and was corroborated by the postconviction testimony of the defense's three experts and the defense's medical literature postdating the trial. The State does not address these arguments.[8] Accordingly, we assume without deciding that, if Stier's revised opinion constitutes a "recantation" under *McCallum* so as to invoke that case's corroboration requirement, Hancock has satisfied this requirement.

¶17   Thus, only one issue—the key issue—remains in dispute: whether Stier's revised cause-of-death opinion creates a reasonable probability of a different result at trial. For the reasons that follow, we agree with the circuit court's conclusion that this requirement was not satisfied.

## C. Summary of Relevant Testimony.

¶18   We begin by summarizing Stier's testimony at both the trial and the postconviction proceedings. Because we must evaluate Stier's postconviction testimony in light of the other evidence presented at trial, we then summarize the relevant testimony of other trial witnesses. *See Plude*, 310 Wis. 2d 28, ¶33 ("A court reviewing newly-discovered evidence should consider whether a jury would

---

[8] It is true that the State's brief contains the following heading: "The postconviction testimony presented by both the State and Hancock confirms there is nothing 'new' here and there is no reasonable probability of a different outcome." And in that section, the State mentions that some of Hancock's corroborating witnesses contradicted Stier's revised opinion on some key points and that their *underlying findings* were not based on new evidence. But the State does not tie these assertions to any case law involving the corroboration requirement for recantation, nor does it develop an argument that the corroboration requirement is not met because Hancock's corroborating evidence is not "newly discovered." *See State v. McCallum*, 208 Wis. 2d 463, 477, 561 N.W.2d 707 (1997) (a recantation must be corroborated by other "newly discovered evidence").

find that the newly-discovered evidence had a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt as to the defendant's guilt."); *Avery*, 345 Wis. 2d 407, ¶¶24-36 (setting forth and applying the standard for evaluating whether "a reasonable probability exists that a different result would be reached in a trial," under which the new evidence is "balanced" "against the evidence presented at trial" (internal quotation marks and quoted source omitted in first quote)).[9]

*i. Stier's trial testimony.*

¶19    At trial, Stier testified about three autopsy findings relevant to this appeal. First, L. had an acute bilateral subdural hematoma. The dura is the outer membrane lining the brain, "hematoma" means bleeding or a "collection of blood," and "bilateral" means on both sides. Thus, a bilateral subdural hematoma is bleeding in the space underneath the dura on both sides of the brain.

¶20    In L.'s case, the bilateral subdural hematoma presented as a thin layer of bleeding "all around the surface of the brain." As Stier explained, "[T]he pattern of this type of subdural [hematoma,] very thin and over much of the

_____

[9] The State presented three new experts at the postconviction hearing to refute Hancock's evidence. The State would have us consider the testimony of these new experts, whereas Hancock argues that our analysis should be confined to the trial evidence and Stier's revised conclusions on L.'s injuries and cause of death. The State has presented no authority supporting the proposition that we may consider its new experts' testimony in our "reasonable probability" analysis; nor, upon our nonexhaustive independent research, have we located any directly applicable case law. Ultimately, however, this appeal does not hinge on the strength or substance of the State's new experts' testimony. Accordingly, we assume without deciding that our "reasonable probability" analysis should not consider the State's additional postconviction hearing evidence. For this reason, we do not summarize that testimony here, noting only that these experts adamantly disputed the medical assumptions forming the basis for Stier's revised opinion and for the opinions of the three experts that Hancock presented at the postconviction hearing to corroborate Stier's recantation.

surface of the brain, is a marker for nonaccidental type of injury generally" and in L., specifically, was "an indicator of nonaccidental head trauma." Stier opined that this hematoma was associated with a brain injury other than "an impact focus"—meaning that L.'s skull was not directly impacted and that L.'s death was "not an impact fatality." Rather, the mechanism of injury was "translational and rotational and angular movement of the brain in the skull," which caused "bridging veins" between the brain tissue and the dura to tear, which then caused the subdural bleed.

¶21 Relatedly, Stier identified a chronic (*i.e.*, weeks or months old) subdural hematoma on L.'s right side of the brain, which was unrelated to the acute bilateral subdural hematoma. The chronic subdural hematoma was "a fibrous scar" that had "no relevance directly to the acute fatal process" and did not "have anything to do with [L.'s] demise."

¶22 Second, Stier received information from other medical personnel involved in L.'s case that "there was a radiographic or an x-ray finding of something on the skull that appeared to be a fracture." Based on his own examination of L.'s skull, including samples of that area of the skull that he sectioned and reviewed microscopically, Stier saw no indications of a skull fracture; instead, he identified only an "irregularity." However, Stier left open the possibility that this "irregularity" could be a fracture, explaining, "I'm not saying that it is [a fracture], I'm not saying that it isn't. I'm simply stating … that it is an irregularity … and I can't further specify." Stier testified that the lack of fracture went "hand-in-hand with [his] whole interpretation of the case," which was "that this is not an impact fatality." Stier further noted that there was no trauma observable on the outside of the skull that might be present if there were a direct impact.

¶23   Third, Stier identified a "special type of fracture" on L.'s left femur (thigh bone) referred to as a "corner fracture," "bucket handle fracture," or "metaphyseal fracture." This type of fracture is "regarded as a nonaccidental type of fracture in the setting of abuse" and "is a unique fracture to abusive pathology."

¶24   Based primarily on these autopsy findings, Stier testified that L. "sustained nonaccidental physical injury" that would have manifested as a "near immediate" "alteration in clinical function" (*i.e.*, loss of consciousness or cessation of breathing). Stier therefore concluded that, "to a reasonable degree of medical certainty," "[L.] died of [a] nonaccidental cause." As to the mechanism of death, Stier testified that "the blood supply to the brain was … compromised" (*i.e.*, because of the tearing of bridging veins), resulting in "injury" and "death" "to the brain tissue … essentially global brain death."

*ii. Stier's postconviction testimony.*

¶25   In his postconviction testimony, Stier discussed or modified these three trial opinions, as well as his cause-of-death conclusion, as follows. First, Stier maintained his opinion that an acute bilateral subdural hematoma is "a marker for nonaccidental type of injury generally." However, Stier testified that, in the years following Hancock's trial, he had performed or witnessed autopsies in which this type of hematoma was *not* associated with inflicted trauma but was instead associated with a nontraumatic hypoxic event (*i.e.*, an event in which the deceased was deprived of oxygen for a reason other than trauma, such as drowning). Therefore, Stier was now "convinced that this finding [of acute bilateral subdural hematoma] can occur in the absence of trauma." He testified that his "change of heart principally rests upon observations that the subdural

hemorrhage[10] can be caused by nontraumatic mechanism," a view that Stier testified was shared by others in the medical profession.

¶26    However, Stier expressly did *not* conclude that the subdural hematomas unassociated with traumatic injury that he had observed in autopsy subjects were *caused by* hypoxia.  Rather, he testified that he "d[id]n't know what caused" those subdural hematomas, just that they were "artifact[s]" observed "at the autopsy table."  As to L.'s case specifically, Stier did not testify that L.'s acute subdural hematoma was *caused by* hypoxia; in fact, he testified that he "d[id]n't necessarily believe that hypoxia is the mechanism for this hemorrhage."

¶27    Second, Stier would not "testify in the same way as [he] did in 2009, regarding whether L.[] had a skull fracture."  Specifically, Stier would *not* leave open the possibility that the "irregularity" he had observed was a skull fracture, and he instead would testify definitively that L. did not have a skull fracture.  Stier testified that he gave less definitive testimony at trial "possibly out of professional respect for other physicians and colleagues" who had identified a skull fracture. He explained that "there was a generalized sense in meetings and discussions … that this was, without question, a traumatic non-accidental fatality," so he felt some level of "peer pressure," "either consciously or subconsciously," not to rule out the "skull fracture" finding.[11]

---

[10]  Stier occasionally used the term "hemorrhage" as a synonym for "hematoma."

[11]  It is possible that Stier was testifying both that he felt "peer pressure" to locate a skull fracture and that he felt "peer pressure" to deem L.'s death nonaccidental.  On these points, Hancock would have us take into account the participation of Dr. Barbara Knox, a former University of Wisconsin child-abuse pediatrician who (according to Hancock) was subsequently "placed … on administrative leave 'because of concerns that arose about … [her] workplace behavior, including unprofessional acts that may constitute retaliation against and/or intimidation

(continued)

¶28 Third, Stier maintained that a femoral bucket-handle fracture "can be and may be an indicator of abuse." However, on direct examination, Stier testified that the bucket-handle fracture he had observed in L.'s femur could also have been caused by "at least eight attempts" to insert an intraosseous line[12] into L.'s tibia (the bone below the knee), which procedure required stabilizing the femur.

¶29 On cross-examination, however, Stier was provided a transcript of the trial testimony of Dr. Thomas Brazelton, a pediatric intensive care physician and one of L.'s emergency department physicians, which indicated that there were only *two* attempts to insert an intraosseous line into L.'s tibia. Moreover, Brazelton testified at trial that there was "no way" the intraosseous line placement could have caused the bucket-handle fracture in L.'s femur. Brazelton testified that a bucket-handle fracture "requires a significant amount of torqueing and twisting and force, and we simply d[id]n't apply that," particularly given that L. was not moving around because he was "essentially in a coma." This and other evidence presented to Stier on cross-examination caused him to retract the opinion elicited on direct examination. Stier ultimately concluded, "Given the additional information that I've reviewed in the proceedings of this day, I would offer that the [bucket-handle] fracture as seen in [L.] is not due to the intraosseous line

of internal and external colleagues." (alteration in original). As previously stated, however, for purposes of this decision, we assume without deciding that there was "a feasible motive for" Stier's trial testimony and that "there are circumstantial guarantees of the trustworthiness of" any new postconviction hearing testimony from Stier. *See State v. McCallum*, 208 Wis. 2d at 477-78; *see supra* ¶16. Accordingly, we need not further address whether or how Dr. Knox's participation in this case may have influenced Stier's trial testimony. For the same reason, we also do not consider the additional information regarding Dr. Knox that is included in Hancock's supplemental filing with this court.

[12] An intraosseous line is placed by inserting a needle directly into the bone and, according to Stier, requires "significant force."

placement."[13] Stier also agreed that, based on his review of the bone structure surrounding L.'s femur, the radiology scans and other evidence, there was "no evidence whatsoever for rickets," which was an alternative suggested by some of Hancock's other postconviction expert witnesses.

¶30 Based primarily on his observations regarding nontraumatic subdural hematomas during the years since Hancock's trial, Stier also testified that he had revisited his cause-of-death conclusion. He testified that he was "now unable to conclude[,] to a reasonable degree of medical certainty, that L.[]'s injuries or death were the result of abuse." He further testified that "a death from natural causes may explain the findings at the autopsy." Moreover, he opined that "there is no definitive cause of death": "[i]n other words, the cause of death is undetermined."

¶31 However, Stier also agreed that he was simply "expressing less of a degree of medical certainty about the conclusions from th[e] autopsy findings" and that:

- "[n]on-accidental trauma, inflicted trauma, abusive head trauma, is still a mechanism that would cause the hypoxia and the brain swelling from direct trauma to the brain in [L.]";

---

[13] As part of Hancock's WIS. STAT. § 974.06 motion, postconviction counsel filed an affidavit containing Stier's revised opinions, including his revised opinion on the potential cause of the femoral bucket-handle fracture. It appears that, in connection with preparing this affidavit, Stier was led to believe *either* that there were eight attempts to insert an intraosseous line into L.'s tibia (requiring femoral stabilization) *or* that there were eight attempts to insert an intraosseous line directly into L.'s femur. In fact, there were eight attempts to insert a *venous* line into L.'s femoral vein but only two attempts to insert an intraosseous line, and the intraosseous line was inserted into the tibia. The mistake of fact as to the number, location, and type of line placements caused Stier to initially testify, on direct examination, that L.'s bucket-handle fracture could have been caused by the intraosseous line placement. As stated by the circuit court, during the course of his postconviction testimony, "Dr. Stier significantly walks back his affidavit statement about an [intraosseous] line causing the fracture."

- "[L.]'s complete collapse in the residence of Ms. Hancock is entirely consistent with a severe inflicted head injury";

- L. "could still have been a victim of child abuse involving inflicted head trauma and inflicted trauma to the leg causing the fracture to a reasonable degree of medical certainty"; and

- "to a reasonable degree of medical certainty, all of the findings in this case are consistent with inflicted head trauma."

Significantly, Stier ultimately testified as follows regarding the likelihood that L.'s fatal injuries were caused by abusive trauma:

> Q. And, in fact, non-accidental trauma child abuse is still the most likely cause for these injuries in your opinion to a reasonable degree of medical certainty, correct?
>
> A. Likelihood. Yes.[14]

¶32 Relatedly, Stier did not proffer an alternative cause of L.'s death that was more likely than the abusive trauma he testified to at trial. Instead, Stier testified as follows. First, as discussed above, Stier did not testify that hypoxia caused L.'s subdural hematoma. Second, Stier was questioned about his autopsy finding of a virus in L.'s heart tissue, which, at the time of the autopsy, he reported "as being of undetermined significance." Stier initially testified that "[t]he heart

---

[14] The parties and circuit court provide different interpretations of this last statement. In her brief-in-chief, Hancock construes Stier's response as meaning that abusive trauma remained the "most likely cause" of the injuries, whereas the State, in its response brief, interprets Stier's response to mean that nonaccidental trauma was "the likely cause" or a "likelihood." The circuit court appears to interpret this testimony in two different ways. First, the court states: "Dr. Stier states, to a reasonable degree of medical certainty, that he believes to a 'likelihood,' that nonaccidental trauma child abuse is still the most likely cause for these injuries." But the court also states: "[Stier] still believes to a reasonable degree of medical certainty that the most likely cause for L.[]'s injuries is nonaccidental trauma child abuse." Because the testimony supports each of these interpretations, and because all of the interpretations support our determination that Stier's revised opinion does not create a reasonable probability of a different result, we do not endeavor to decide which of these varying interpretations is correct.

virus provides a potential alternative, viable explanation of L.[]'s demise." But on further questioning, Stier did not provide a mechanism or explanation for how the heart virus might cause L.'s death. Rather, Stier testified that he "d[id]n't know what [the evidence of a heart virus] means," that "[i]t could mean something, and it could mean nothing," and that he could not conclude, one way or the other, whether the heart virus caused or contributed to L.'s death. Stier also agreed that there had not been any additional medical testing on L.'s heart tissue, nor was he aware of any medical literature that supported the theory that L.'s heart virus contributed to L.'s death.

### iii. Trial testimony of the State's expert witnesses.

¶33 At trial, the State presented four physicians as expert witnesses: a pediatric radiologist, a forensic pathologist, a pediatric neuropathologist, and a pediatrician. Because this testimony was generally consistent, we next summarize the relevant testimony collectively.

¶34 All four experts testified—consistent with Stier's trial testimony— that L. died from an acute traumatic brain injury. The witnesses who were asked to opine on the specific mechanism of injury testified (also consistent with Stier's trial testimony) that the motion of L.'s brain within his skull caused bridging veins connecting the brain and the skull to tear, resulting in lack of oxygen to the brain and brain death. Unlike Stier, three of the experts, including the pediatric radiologist, specifically testified that L. had a skull fracture consistent with a direct impact to the skull (*i.e.*, blunt force trauma). According to the pediatric radiologist, the skull fracture was "pretty clear on the x-ray" (the x-ray was described and shown to the jury). The other two State experts based their findings of a skull fracture on—among other things—their microscopic reviews of the

same slides of the sections of L.'s skull that Stier had prepared and reviewed.  The same two experts noted that the lack of external signs of skull trauma was not inconsistent with a finding of a skull fracture (the third expert did not opine one way or the other on this point).

¶35     All four experts testified that L. would have experienced severe symptoms immediately following the trauma—such as vomiting, going limp, or having seizures—and that (contrary to Hancock's testimony) L. would not have been alert, behaving normally, or able to eat.

¶36     Three of the State's experts were asked to discuss the significance of L.'s femoral bucket-handle fracture.  These experts testified that the bucket-handle fracture was acute (*i.e.*, no more than one month old, with two experts opining that the fracture was less than one week old).  The experts further testified that this type of fracture was highly indicative of nonaccidental trauma.  For example, one expert noted that "in the vast, vast majority" of cases, this fracture in infants was caused by "abusive" "twisting and wrenching."  Another expert testified that these fractures "are almost diagnostic of child abuse" because they are caused by "a twisting, pulling, jerking kind of action."

¶37     The three experts who were asked to specifically opine on the accidental versus nonaccidental nature of L.'s death testified that L.'s death was nonaccidental.  One expert explained, for example, that L. had no history of disease or older, nonaccidental trauma that could produce "this extraordinary state of cardiovascular collapse."

¶38     Some experts were asked—in response to Hancock's statement to investigators—whether L.'s head injuries could have been caused by a three-year-old child falling onto L. while L. was lying on his back on the floor, which,

19

according to Hancock, allegedly occurred approximately two to three hours before she called 9-1-1. These experts testified that a fall such as Hancock described would not have caused L.'s injuries. One expert noted that it would have taken considerable force to cause those injuries; that the acute subdural hematoma—especially the *bilateral* hematoma—would be "very, very unusual"; and, crucially, that L. would not have eaten and acted normally in the hours afterwards. Another expert noted that L.'s clinical presentation—torn bridging veins on both sides of the head, coupled with the lack of external injuries—was wholly inconsistent with a three-year-old child accidentally falling on L.

¶39    Three of the experts were asked to opine on the findings of defense expert Dr. Uscinski, who, as discussed in more detail below, posited that L.'s acute subdural hematoma was due to "re-bleeding" of a chronic subdural hematoma caused by birthing trauma. These experts testified that re-bleeding could not have caused L.'s injuries and ultimate death. The pediatric radiologist explained that Uscinski's proposed mechanism of injury was not possible because the acute subdural hematoma was "in a different area than the old subdural."

¶40    The pediatric neuropathologist opined that, for three reasons which we now summarize, L.'s death could not have been caused by the re-bleed of a chronic subdural hematoma.

¶41    First, the chronic subdural hematoma was on L.'s right side of the brain, whereas the acute subdural hematoma was bilateral as well as in the posterior fossa (a small region at the bottom of the skull). It was "anatomically impossible" for the blood from the chronic subdural hematoma to have traveled to those other regions: the blood "could not have come from the top into the posterior fossa and it also, since it was on the right side, could not have gone to the

left side." Second, this expert viewed L.'s chronic subdural hematoma microscopically and determined that it "had no extraneous blood vessels in it," meaning that there was no physical way that the chronic hematoma could have bled. Third, more generally, this specific mechanism of re-bleed—a hematoma in an infant caused by birthing trauma, which healed but then later re-bled—was "exceptionally rare."

¶42 The pediatrician testified that a re-bleed from L.'s chronic subdural hematoma could not have caused "a new subdural [hematoma] on the other side of [L.'s] head." Moreover, re-bleeds typically manifest as a small amount of bleeding, without any clinical change. And in those "few reported" cases in which a re-bleed caused a clinical change, the children "got sick over quite a period of time." That is, "[i]t was just sort of a gradual process" over "[d]ays to weeks": "[y]ou don't look normal one minute and suddenly you are devastated." Here, in contrast, the pediatrician's review of L.'s records indicated that L. had been developing and progressing normally in the weeks before his injury.[15]

---

[15] We note that, in addition to the expert pediatrician's testimony, the State's trial evidence also included the testimony of L.'s pediatrician and of the obstetrician who delivered L. Their testimony contradicts the picture of L.'s birth and health that Hancock portrays in her briefing on appeal. For example, Hancock asserts that L. had a "complicated medical history" and that he was "born one month premature by [a] … complicated caesarean section." In support of these characterizations, Hancock largely relies on the postconviction testimony of her experts. But as previously noted, this testimony was offered solely to corroborate Stier's revised opinion. As also previously discussed, it is the *trial* testimony that we consider in conjunction with the newly discovered evidence when determining whether there is a reasonable probability of a different outcome. And the trial testimony of L.'s pediatrician and the obstetrician do not support Hancock's dire characterization of L.'s birth or health situation. The obstetrician's testimony did not demonstrate anything particularly "complicated" about the caesarean section he performed. He testified that a caesarean section was performed because L. was in the "transverse lie" position and that L.'s "Apgar" scores (testing a baby's color, heart rate, respiratory effort, muscle tone, reflex, and irritability) following birth were "normal" and raised no concerns about trauma during labor or birth. The testimony from L.'s pediatrician showed that L. was developing normally, with no significant health issues. Moreover, contrary to Hancock's assertion that L. was born a

(continued)

Furthermore, L. was described by his parents as eating and behaving normally prior to being dropped off at Hancock's on the day of his collapse.

### iv. Trial testimony of Hancock's expert witness.

¶43    Dr. Uscinski, a clinical neurosurgeon, opined that L.'s head sustained trauma during his delivery, causing bleeding that, at the age of four months, had formed into a chronic subdural hematoma. The chronic subdural hematoma began to re-bleed, causing a mass that pushed on L.'s brain and caused intracranial pressure. Uscinski described this as "a long-standing chronic process, meaning weeks or months, that's been going on and it's been building." Uscinski opined that L.'s head circumference—which Uscinski identified as growing "at a disproportionate rate" in the weeks before L.'s death—was indicative of the growth of this pressure-causing mass. Uscinski testified that this mass (and the resulting intracranial pressure) either began to increase rapidly or reached a sudden, critical point at which L.[] suffered "respiratory insufficiency." At that point, L. either stopped breathing on his own or his airway was obstructed by vomit or blockage that he was unable to clear but, in either case, he stopped breathing. Uscinski testified that he did not believe that L. had sustained blunt force trauma and that torn bridging veins were not responsible for L.'s acute subdural hematoma.

¶44    Uscinski disagreed with Stier and other State expert witnesses who testified that L. had only a right chronic subdural hematoma (thus making it impossible, according to the State's witnesses, for re-bleeding to take place on

month prematurely, L.'s pediatrician testified that because full "term" is considered thirty-seven weeks, L. was actually only "a week and a day shy of full term."

both sides of the brain). Uscinski testified that L. also had a left chronic subdural hematoma; he further testified that "the right side of the subdural space … communicates with the left side." Thus, according to Uscinski, L. could be considered to have a one bilateral chronic subdural hematoma (spanning the right and left side of the brain), as well as a second chronic subdural hematoma in the posterior fossa. In addition, Uscinski disagreed with a State's expert that L.'s chronic subdural hematoma was "avascular" (*i.e.*, that it could not bleed). He testified, rather, that L.'s chronic subdural hematoma could and did bleed.

¶45    Uscinski agreed that his re-bleed opinion did not address or account for the presence of L.'s femoral bucket-handle fracture.

*v. Hancock's trial testimony.*

¶46    Hancock testified at trial, as follows. On the day of L.'s collapse, she was caring for several small children in addition to L. L. arrived at her house at approximately 7:30 a.m. Hancock did not describe any abnormal behavior during the first part of the morning: L. ate around 8:45 a.m. and fussed and cried at times, but also seemed to be happy at other times. At some point, Hancock left L. on the floor during a diaper change. As she was walking back, she heard L. "crying really hard," making "[a] different cry than [she] had heard before." As Hancock entered the room, she saw a three-year-old child using her arms to "get[] up off of" L.

¶47    L. cried for about twenty minutes before Hancock was able to calm him. L. then fell asleep for about fifteen minutes. At that time, it was about 11 a.m., and L. was being "fussy"; Hancock "could tell he was getting hungry." Hancock gave him his pacifier, made lunch for the other children, and fed L. sometime close to his usual feeding time of between 11:45 a.m. and 12:15 p.m. It

took L. approximately twenty-five minutes to eat, and he drank about four ounces. Hancock held him for about fifteen or twenty minutes until he again fell asleep, and then she laid him down for a nap.

¶48    When Hancock went to check on L., she observed that he was unresponsive and limp, and his eyes "were like slits."  Hancock called 9-1-1 and followed the instructions she was given over the phone, including performing CPR.  Emergency personnel arrived shortly after and took L. to the hospital. Other testimony established that Hancock placed the 9-1-1 call at 12:46 p.m.

### D. *Stier's Revised Opinion Does Not Create a Reasonable Probability That a Different Result Would Be Reached in a Trial.*

¶49    For reasons we now explain, we conclude that Stier's revised opinion does not create "a reasonable probability … that a different result would be reached in a trial," meaning that there is no "reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to [Hancock's] guilt."  *See Avery*, 345 Wis. 2d 407, ¶25.  Put slightly differently, a jury would not find that Stier's revised cause-of-death opinion had such "a sufficient impact on other evidence presented at trial that [the] jury would have a reasonable doubt as to [Hancock's] guilt."  *See id.* (internal quotation marks and quoted source omitted).  We begin by analyzing Stier's three revised autopsy findings, and then discuss his revised opinion on the ultimate cause of death.

#### i. *Acute bilateral subdural hematoma.*

¶50    Stier did not modify his trial opinion that L. had an acute bilateral subdural hematoma or that this type of hematoma is "a marker for nonaccidental type of injury generally."  Regarding L. specifically, Stier still agreed at the postconviction hearing "to a reasonable degree of medical certainty [that] all of the

findings in this case are consistent with inflicted head trauma." Indeed, not only did Stier never offer, to a reasonable degree of medical certainty, an explanation for L.'s hematoma other than abuse, but he also testified that, with respect to L.'s head and other injuries, child abuse remained, to a reasonable degree of medical certainty, a likely, or even the most likely, cause.

¶51     Moreover, as noted, Stier testified that the "[t]he principal reason for [his] change of opinion [regarding L.'s cause of death] is the repeated recognition of nontraumatic subdural hemorrhages in individuals who die with a hypoxic mechanism." However, Stier did not testify that this association between nontraumatic hypoxia and acute bilateral subdural hematoma indicated that: (1) the hematomas in these autopsy subjects were caused by hypoxia, or (2) L.'s hematoma was caused by hypoxia. Nor did Stier retract his trial testimony that L.'s bridging veins were torn or that "movement of the brain in the skull" could have torn L.'s bridging veins, leading to lack of oxygen to the brain and "global brain death."

¶52     Thus, Stier's postconviction hearing testimony regarding L.'s acute bilateral subdural hematoma is largely consistent with his trial testimony. The postconviction hearing testimony allows for the possibility that subdural hematomas may *exist* in patients who (by all accounts) did not die from trauma, but the testimony does not relate to the *cause* of those subdural hematomas either generally or in L.'s case specifically.

*ii. Skull fracture.*

¶53     As stated, Stier modified his trial testimony regarding L.'s skull fracture in that he would now definitely opine that L. did not have skull fracture. Considering Stier's substantially similar testimony at trial and the unequivocal

trial testimony from three of the State's other experts that L. had a skull fracture, we conclude that Stier's modified opinion on this point does not create a reasonable probability of a different outcome at trial. At trial, the jury was already presented with a dispute between Stier and the State's other experts regarding the existence of a skull fracture. This debate was explored at length during the witnesses' testimony and during counsels' closing arguments.

¶54 For example, during trial, Stier was asked what his autopsy examination of L.'s skull revealed and he responded, "Several negative findings. Meaning absence of an impact focus of the scalp, meaning no hemorrhagic or bloody lesion of the scalp that would imply a direct impact. No impact focus on the scalp bone itself, I should say no acute impact focus." He further testified, "In the case of this autopsy there was no scalp injury, no blunt impact to the scalp." On questioning by the prosecutor, he was steadfast in opining that he did not observe a skull fracture, despite the opinions of other professionals:

> [Stier]. So in this case there was a reported finding of an irregularity on the parietal skull, the left parietal skull of [L.], that was presented to me as a fracture. And under oath and in my report I cannot say that I identified a fracture. I saw some irregularity, but I can't say that that is a fracture for sure. Macroscopically; that is with the naked eye, the skull bone looked uniform. There was no gross evidence of hemorrhage…. And under the microscope I cannot identify a fracture.
>
> And it actually goes hand-in-hand with my whole interpretation of the case that this is not an impact fatality. This is a unique type of nonaccidental child abuse fatality.
>
> Q. Now, doctor, am I correct in understanding your irregularity, in other words you are saying that you can't say that it is and you can't say that it's not a fracture, it's just an irregularity?
>
> A. Well, I'm saying that the radiologists have identified something. And I'm 100 percent sure that they have identified something and they see something. But I

do not see what they are seeing, and I am not a radiologist, I'm a pathologist. So I can only say what I see and what I don't using the tools and the training that I have.

So I think you are accurate. I'm not saying that it is. I'm not saying that it isn't. I'm simply stating, as I put in my report, that it is an irregularity and it is radiographic and I can't further specify.

During cross-examination, defense counsel elicited further testimony from Stier that he did not find a fracture, while also emphasizing the thoroughness of Stier's autopsy:

Q. And you were satisfied upon examining the outside of the skull that you had not seen evidence of a fracture?

A. Well, satisfied I don't know, but I was convinced that I was not observing the same lesion to the same degree as the radiologist.

Q. And then you then had the opportunity to examine that particular piece of skull even, further, did you not?

A. Yes.

Q. And that's because you removed it?

A. Yes.

Q. And so now you could look at both sides of it, for instance?

A. Yes.

Q. And did you do so?

A. Yes.

Q. And looking on the inside, did you observe anything that changed your opinion?

A. Not with respect to that focus of interest, no.

Q. And then you took that piece and indeed you sectioned it into samples, correct?

27

A. Yes.

Q. And what was your intent to do with those samples?

A. Well, to study them microscopically, because there are examples of what are called hairline fractures or fractures that are very, very—at the smallest end of the fracture spectrum. And so in an effort to do my part of my examination, I applied the microscope to that part of the bone.

Q. And did you see anything that confirmed radiographic findings or indications of skull fracture?

A. Not in my opinion.

Q. Thank you. And, again, you had opportunity to look at each and every section of these tissue sections that you created?

A. Yes.

Q. For as long as you wanted?

A. Yes.

¶55 Additionally, as discussed above, three of the State's other trial experts, including a radiologist, testified that L. had a skull fracture. Highlighting the dispute between Stier and these experts, one of the experts, when asked by defense counsel about Stier's autopsy report finding that the section slides of the skull show an "intact bone," responded, "Well, he is wrong, it was not intact."

¶56 Also, in closing arguments, counsel for each party repeatedly referred to the dispute between Stier and the State's other experts on this point. Defense counsel relied on Stier's testimony that he did not find a skull fracture, arguing that "pathology confirms radiology, not the other way around." The prosecutor argued that the jury should credit the State's other experts on this point rather than Stier, while also arguing that even if the jury removed the skull fracture

from the equation, it was still Stier's opinion that "this is nonaccidental physical injury caused by rotational force."

¶57 Stier's revised testimony—which more firmly states that there was no skull fracture—does not significantly change the debate between the trial experts on this point and is therefore of minimal impact. His more definitive testimony does not make it more probable, for example, that the jury would find that L. died from re-bleeding as Uscinski argued, or from some other accidental mechanism, such as a three-year-old child falling on L. several hours before his collapse. Moreover, as the prosecutor noted in closing—it was not necessary for the State to prove that L. had a skull fracture in order to prove that Hancock recklessly caused L.'s death. In fact, as mentioned above, Stier himself testified at trial that the lack of a skull fracture went "hand-in-hand" with his conclusion that L.'s death was caused by rotational movement of the brain in the skull (*i.e.*, shaking).

¶58 In sum, we do not conclude that Stier's revised skull-fracture testimony, even if fully credited, creates a reasonable probability that a jury would have a reasonable doubt as to Hancock's guilt.

*iii. Femoral fracture.*

¶59 As to L.'s bucket-handle fracture, Stier ultimately retracted his affidavit opinion that this fracture could have been caused by attempts in the emergency department to insert an intraosseous line into L.'s leg. Stier did not offer any other nonabusive cause of this fracture, which, as testified to by the State's trial witnesses, was acute and highly indicative of abuse. As a result, Hancock has not shown that any change in Stier's testimony on this fracture would have had an impact on the jury's verdict.

29

¶60  In sum, to the extent Stier revised his findings on the acute bilateral subdural hematoma, skull fracture, and bucket-handle fracture, these revised opinions do not support Hancock's request for a new trial based on newly discovered evidence.

*iv.  Ultimate cause of death.*

¶61  As previously stated, Stier also revised his opinion regarding L.'s ultimate cause of death, from his opinion at trial that to a reasonable degree of medical certainty L. died from nonaccidental inflicted injury, to his postconviction testimony that L.'s cause of death is "undetermined."  Considering this revised testimony in the context of Stier's complete postconviction hearing testimony and all of the other evidence at trial, we cannot conclude that it creates a reasonable probability of a different outcome.  Stier testified at the postconviction hearing that L.'s symptoms, presentation at the hospital, and all of the postmortem findings remained "consistent with" nonaccidental trauma.  Stier further testified that, to a reasonable degree of medical certainty, nonaccidental trauma remained either a likely or the most likely cause for L.'s injuries.  Even construing Stier's postconviction testimony as meaning that it was only *likely* that nonaccidental trauma caused the injuries, we agree with the State that this opinion is "sufficiently definite to remove it from the realm of conjecture," meaning that Stier's expert testimony would be admissible at retrial as part of the State's case-in-chief.  *See Drexler v. All Am. Life & Cas. Co.*, 72 Wis. 2d 420, 432-33, 241 N.W.2d 401 (1976) ("A medical opinion is not admissible if it is based upon speculation and conjecture;" however, "expressions such as … 'likely'" "demonstrate that [the expert is] expressing [an] expert medical opinion" to the requisite "degree of medical certainty."); *see also Roy v. St. Luke's*, 2007 WI App 218, ¶20, 305 Wis. 2d 658, 741 N.W.2d 256 (clarifying that it is only the party with the burden

of proof that "must produce testimony based upon reasonable medical probabilities" and that the opposing party is not "restricted to this requirement" but may instead present "medical proof couched in terms of possibilities").

¶62     Accordingly, the *totality* of Stier's testimony on L.'s cause of death reflects that Stier—as he himself agreed—was merely "expressing less of a degree of medical certainty about the conclusions from th[e] autopsy findings." Thus, a jury hearing all of Stier's postconviction hearing testimony might appreciate some new nuances in Stier's findings—for example, that subdural hematomas may exist in patients who did not die of trauma, or that the virus in L.'s heart "could mean something, and it could mean nothing." But Stier would still tell the jury that nonaccidental trauma was a likely or the most likely cause of these injuries, and he would not offer the jury any concrete alternative possible cause of death. As the circuit court determined, "How much does Stier really change his testimony? Not much at all, is the finding of this court."[16]

¶63     For all of these reasons, we conclude that Stier's revised opinion would not create "a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to [Hancock's] guilt." *See Avery*, 345 Wis. 2d 407, ¶25.[17]

---

[16] The circuit court also concluded that "If Dr. Stier were to testify in a new trial, he would still be a prosecution witness."

[17] In analyzing whether the newly discovered evidence creates a reasonable probability of a different result, we compare Stier's revised opinion to only the *medical* evidence presented at trial, and (with the exception of Hancock's testimony) do not discuss other, nonmedical trial evidence. We do so in part because this comparison of the medical evidence is sufficient to sustain our conclusion in the "reasonable probability" determination, but also because, as best we can discern, Hancock, the appellant in this case, has not provided this court with a complete transcript of the trial. As one example, the court minutes reflect that a witness, A.G., testified for
(continued)

*E. Hancock's Additional Arguments.*

¶64     Aside from her direct arguments on the strength of Stier's revised opinion, Hancock raises five arguments as to why she is entitled to a new trial on the basis of newly discovered evidence. We discuss and reject these arguments in turn.

¶65     First, Hancock implies that reversal of the circuit court is "compelled" by the holdings of *Edmunds*, 308 Wis. 2d 374, and *Plude*, 310 Wis. 2d 28. We disagree. In *Edmunds*, this court recognized the existence of newly discovered evidence in the form of "a significant and legitimate debate in the medical community" that "only emerged in the ten years" between Edmunds's trial (1995) and her postconviction motion (2006) "over whether infants can be fatally injured through shaking alone" and whether and how "shaken baby syndrome" presents. *Edmunds*, 308 Wis. 2d 374, ¶¶2, 6, 15. We concluded that this "shift in mainstream medical opinion" meant that "[n]ow, a jury would be

---

the State at trial; however, her testimony does not appear to be included in the record. We note that in closing argument, the prosecutor repeatedly referred to testimony from A.G., whose child attended Hancock's daycare. The prosecutor discussed A.G.'s testimony regarding disparaging remarks that she heard Hancock make about L. on the morning of his collapse, and A.G.'s discomfort on another occasion with how Hancock held L.

Although we do not rely on the prosecutor's closing statements for our conclusions in this matter, we refer to these statements to demonstrate that the record appears to be incomplete. Thus, there may be other, nonmedical, evidence from trial, not included in the record, that supports the circuit court's determination that the newly discovered evidence (Stier's revised opinion) does not create a reasonable probability of a different result at trial. "It is the appellant's responsibility to ensure completion of the appellate record and 'when an appellate record is incomplete in connection with an issue raised by the appellant, we must assume that the missing material supports the trial court's ruling.'" *State v. McAttee*, 2001 WI App 262, ¶5 n.1, 248 Wis. 2d 865, 637 N.W.2d 774 (quoted source omitted); *see also* *Haack v. Haack*, 149 Wis. 2d 243, 247, 440 N.W.2d 794 (Ct. App. 1989) (recognizing that when transcripts are missing, we must assume that any fact essential to sustain the trial court's decision is supported by the record).

faced with competing credible medical opinions" on the infant victim's cause of death, creating "a reasonable probability that a jury, looking at both the new medical testimony and the old medical testimony, would have a reasonable doubt as to Edmunds's guilt." *Id.*, ¶23.

¶66    Nothing in *Edmunds* "compel[s]" a new trial in Hancock's case. First, in contrast to *Edmunds*, this case does not involve a medical debate on shaken baby syndrome that has emerged since trial. Hancock's trial took place in 2009, not only after our decision in *Edmunds*, but also well after the emergence of the medical theories on shaken baby syndrome upon which Hancock appears to rely. Thus, as Hancock herself concedes, to the extent there is controversy in the medical field on the issue of abusive head trauma in infants, it "was already controversial … at the time of Ms. Hancock's trial" and defense counsel could have presented evidence on it. The circuit court reached the same conclusion: in discussing the medical literature Hancock presented in the postconviction proceedings, the court determined that "the origins of all the proposed theories predate the time of trial, and relate to disputed issues raised at trial."

¶67    This case is likewise distinguishable from *Edmunds* because, as discussed above, the newly discovered evidence in this case—Stier's revised opinion—cannot be said to create "a reasonable probability that a jury, looking at both the new medical testimony and the old medical testimony, would have a reasonable doubt as to [Hancock's] guilt." *Id.*, ¶23.

¶68    Nor does *Plude* compel reversal. In that case, our supreme court concluded that, "[i]n a trial rife with conflicting and inconclusive medical expert testimony about a case … based on 'circumstantial evidence,' there exists a reasonable probability that, had the jury discovered that [a key State expert

witness] lied about his credentials, it would have had a reasonable doubt as to Plude's guilt." *Plude*, 310 Wis. 2d 28, ¶36; *see id.*, ¶¶2, 8, 23-29. That holding was based on unique facts not present here, and *Plude* does not stand for the proposition that a defendant is entitled to a new trial whenever a State expert modifies his or her trial evidence in any respect. *See id.*, ¶¶36-49.

¶69 Second, Hancock argues that a reversal would be "consistent with the holdings of other appellate courts that changes in a medical examiner's cause-of-death opinion are sufficient to create a reasonable probability of a reasonable doubt even when the medical examiner is uncertain about what actually caused the deceased's death or is merely expressing less certainty regarding the cause of death." But the authority to which Hancock cites, even if it were binding, is inapposite. In *Souter v. Jones*, 395 F.3d 577, 588-97 (6th Cir. 2005); *Ex Parte Henderson*, 384 S.W.3d 833, 833-34 (Tex. Crim. App. 2012); and *Ex Parte Robbins*, 478 S.W.3d 678, 685, 692 (Tex. Crim. App. 2014), the respective defendants were entitled to the relief requested, in part, because the prosecution's expert(s) largely or wholly disavowed their trial testimony. This is not the case here, particularly given Stier's postconviction testimony that a likely, or the most likely, cause of L.'s fatal injuries was nonaccidental trauma.

¶70 Third, Hancock argues that the circuit court erroneously based its reasonable probability determination on its conclusion that Stier's postconviction testimony was less credible than his trial testimony, contrary to our supreme court's holding in *McCallum*. *See McCallum*, 208 Wis. 2d at 474-76 (the court may not base its reasonable probability determination on the credibility of the new evidence unless the court concludes that the new evidence is incredible as a matter of law); *see also Edmunds*, 308 Wis. 2d 374, ¶¶17-18 (applying this principle). Given that Hancock does not direct us to specific portions of the circuit court's

written decision that support this argument, we might end our analysis here. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we do not address arguments that are undeveloped). For the sake of completeness, however, we note that, on our devo review of the reasonable probability determination, we have not reached our conclusion because we deem Stier's postconviction hearing testimony less credible than his trial testimony. Rather, we conclude that Stier's postconviction hearing testimony, when considered in the context of all the evidence presented at trial, does not create a reasonable probability that a jury would have a reasonable doubt as to Hancock's guilt. *See Avery*, 345 Wis. 2d 407, ¶25; *see also Vanstone*, 191 Wis. 2d at 595 (we may affirm on grounds different than those relied on by the circuit court).

¶71      Fourth—potentially along similar lines—Hancock argues that the circuit court erroneously "base[d] its reasonable-probability determination on its own belief that the State's evidence was stronger than Ms. Hancock's [evidence]." In support of this position, Hancock cites *Edmunds*, 308 Wis. 2d 374, ¶18, and the majority and concurring opinions in *McCallum*, 208 Wis. 2d at 474-75; *id.* at 487 (Abrahamson, C.J., concurring). Preliminarily, it is unclear as to which "evidence" Hancock is referring (postconviction hearing versus trial), and she does not explain this argument further or apply the relevant holdings from these cases to the circuit court's decision. For this reason alone, we might decline to consider this argument further. *See Pettit*, 171 Wis. 2d at 646. However, again, given that we have reviewed the reasonable probability determination de novo, it suffices to note that we have reached our conclusion based on the standards required by precedent—namely, whether there is a "reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to [Hancock's] guilt," *see Avery*, 345 Wis. 2d 407, ¶25, or, stated differently,

"whether a jury would find that the newly-discovered evidence had [such] a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt as to the defendant's guilt." *Plude*, 310 Wis. 2d 28, ¶33.

¶72    Fifth, and finally, Hancock argues that "[b]ecause Dr. Stier testified that he would now tell the jury there are plausible non-abusive causes for L.[]'s injuries and death, the circuit court committed reversible error in holding that there was not a reasonable probability that a jury conscientiously following the court's instructions would have reasonable doubt."  In support of this argument, she cites *State v. Poellinger*, 153 Wis. 2d 493, 502, 451 N.W.2d 752 (1990),[18] which, according to Hancock, stands for the proposition that "where the State exclusively relies on circumstantial evidence to prove a crime, as it did here, the State must not only prove each element of the crime beyond a reasonable doubt but also disprove every reasonable theory of innocence."  Presumably, Hancock is relying on the following language from *Poellinger*:

> When circumstantial evidence is used to prove guilt, the Wisconsin courts ordinarily follow the practice of instructing the jury that it must acquit the defendant unless, after a careful consideration of all the evidence, that evidence cannot be reconciled to support any reasonable theory consistent with the innocence of the accused.

*Id.*  Hancock's argument on this point is difficult to follow, but if she means to argue that Stier's revised opinion must necessarily lead to an acquittal, this assertion is unsupported and completely ignores all of the other evidence presented at trial.

---

[18] Hancock also cites *State v. Johnson*, 11 Wis. 2d 130, 135, 104 N.W.2d 379 (1960), but we discern nothing in that opinion that could support her position.

¶73    Furthermore, to the extent Hancock reads *Poellinger* to require a higher burden of proof for the State in cases involving circumstantial evidence, that interpretation is not supported.  In fact, *Poellinger* explicitly states that direct and circumstantial evidence are treated alike under the law:  "whether the evidence presented at trial to prove guilt is direct or circumstantial, it must be sufficiently strong and convincing to exclude every reasonable hypothesis consistent with the defendant's innocence." *Id.*  Thus, a case built entirely on circumstantial evidence imposes no additional burden on the State, and "the rule that the evidence must exclude every reasonable hypothesis of innocence refers [only] to the evidence which the jury believes and relies upon to support its verdict." *Id.* at 503.  In short, nothing in *Poellinger* or other case law supports the premise that Stier's revised opinion would alter the State's burden, which would remain, to prove each element of the crime beyond a reasonable doubt.

## II.  New Trial in the Interest of Justice.

¶74    Hancock next argues that, pursuant to this court's statutory and inherent authority, we should exercise our discretion to grant her a new trial in the interest of justice.  *See* WIS. STAT. § 752.35 (providing for this court's discretionary reversal power); *Avery*, 345 Wis. 2d 407, ¶38 n.17 (this court has the statutory and inherent authority, in its discretion, to reverse a criminal conviction on a WIS. STAT. § 974.06 motion).  "There are two categories of cases in which we may reverse in the interest of justice:  (1) when the real controversy has not been

fully tried and (2) when it is probable that justice has miscarried for any reason." *State v. Burns*, 2011 WI 22, ¶24, 332 Wis. 2d 730, 798 N.W.2d 166.[19]

¶75 "The real controversy has not been fully tried" where: "(1) Either the jury was not given an opportunity to hear important testimony that bore on an important issue in the case, or (2) the jury had before it testimony or evidence which had been improperly admitted, and this material obscured a crucial issue and prevented the real controversy from being fully tried." *Id.* (internal quotation marks and quoted source omitted). "Under the second prong of the discretionary-reversal statute, the 'miscarriage of justice' prong, … the court [must] conclude that there would be a substantial probability that a different result would be likely on retrial." *Id.* (internal quotation marks and quoted source omitted). Under either prong, we should exercise our discretionary reversal power "only in exceptional cases." *Avery*, 345 Wis. 2d 407, ¶38 (internal quotation marks and quoted source omitted). "The [interest of justice] statute [WIS. STAT. § 751.06] was not intended to vest this court with power of discretionary reversal to enable a defendant to present an alternative defense at a new trial merely because the defense presented at the first trial proved ineffective." *State v. Neumann*, 2013 WI 58, ¶146, 348 Wis. 2d 455, 832 N.W.2d 560 (alterations in original; quotation marks and quoted source omitted).

¶76 Hancock argues that this is such an "exceptional case" and that she is entitled to a new trial under either prong. We disagree. Hancock's arguments

---

[19] "The discretionary reversal power of [the supreme] court and the court of appeals is coterminous"; accordingly, we rely on case law interpreting our supreme court's statutory (under WIS. STAT. § 751.06) and inherent authority to reverse a criminal conviction in the interest of justice. *See State v. Avery*, 2013 WI 13, ¶38 n.17, 345 Wis. 2d 407, 826 N.W.2d 60.

with respect to both prongs are largely predicated on her assertion that trial counsel was inadequate. Notably, however, Hancock raised an ineffective assistance of trial counsel claim in the circuit court, which the court denied in a thorough written decision, and Hancock does not renew her ineffectiveness claim on appeal.[20] More importantly, she ignores significant findings by the circuit court that directly bear on her current arguments as to trial counsel's alleged inadequacy.

¶77    For example, Hancock argues that trial counsel "presented only a single expert," Uscinski, "who was precluded from offering critical testimony regarding L.[]'s purported skull and femur fractures and whose theory about L.[]'s brain injury was easily dispelled by the State and found 'remarkably unpersuasive' by the [trial] court." She further argues that despite trial counsel's familiarity with *Edmunds*, counsel "failed to introduce available evidence showing that the State's expert testimony was highly controversial in the medical community."

¶78    In making these arguments, Hancock fails to address the circuit court's relevant factual findings with respect to counsel's performance (to which we defer), including the following. The court noted that trial counsel's questions

---

[20] Hancock cites *State v. Jeffrey A.W.*, 2010 WI App 29, 323 Wis. 2d 541, 780 N.W.2d 231, to support the premise that alleged errors on the part of trial counsel may serve as a basis for an interest of justice claim on appeal, even when, as here, the ineffective assistance of counsel claim was rejected in circuit court and not renewed on appeal. It is true that in *Jeffrey A.W.*, this court concluded that, although trial counsel was not constitutionally ineffective, counsel's errors nevertheless led to the real controversy not being fully tried. *Id.*, ¶¶7-21. However, unlike Hancock, the defendant in *Jeffrey A.W.* did not abandon his ineffective assistance claim on appeal, but instead squarely raised it, in addition to an interest of justice claim. Despite this distinction, for purposes of this appeal, we will assume without deciding that alleged inadequacies of trial counsel may serve as a basis for an interest of justice claim, even when a defendant has abandoned the ineffective assistance claim on appeal.

at the preliminary hearing showed an awareness of numerous medical issues relevant to Hancock's case, including whether: "[s]ubdural bleeding can have causes other than nonaccidental trauma;" "shaking in connection with blunt force trauma was needed to produce certain injuries;" and "hypoxia itself could produce subdural bleeding" or cause "brain damage." Counsel retained a biomechanical expert in 2008. Following the State's filing of its expert reports in December 2008, it became clear to trial counsel that the State "would be focusing on blunt force trauma instead of shaking as the mechanism of injury to L.[]." Therefore, trial counsel also hired a pathologist, George Nichols, who had testified as a defense expert in the postconviction hearing in the *Edmunds* case. Nichols reviewed over twenty-five documents related to the case, and submitted a report to trial counsel in February 2009, in which Nichols concluded that although he did not believe there was a skull fracture, L.'s head hit or was hit by something, which caused L.'s death. Nichols further informed trial counsel "that he could not testify favorably for Hancock because he would testify that, in his opinion, the fracture to L.[]'s femur was a classic sign of abuse."

¶79    After trial counsel realized that he should not call Nichols as a witness at trial, counsel was "scrambling" to find an expert in the month and a half before trial who would "focus on the allegations regarding injury to the head and not look at the entire body." Trial counsel's search led him to Uscinski, a neurosurgeon, who was recommended to trial counsel by at least two people, including the biomechanical expert. Trial counsel chose Uscinski "because he presented an alternative theory for the injury and cause of death," namely, re-bleeding. Counsel "believed the pieces seem to fit very well together, presenting the defense with a reasonable hypothesis." Counsel also subpoenaed Stier because he wanted to make sure Stier testified; according to trial counsel,

Stier consistently maintained that he did not observe a skull fracture. Thus, "on the biggest issue that [counsel] perceived to be a problem, the skull fracture, Dr. Stier was favorable to the defense."

¶80 The circuit court further found that trial counsel's "cross-examination of the State's experts, including Dr. Stier, was very thorough" and that counsel "spent a good number of days and weeks working on nothing but preparing for trial." The court discussed counsel's detailed cross-examination outlines for Stier and for each of the State's experts. The circuit court thoroughly addressed and rejected many of the claims of inadequacy that Hancock now alleges on appeal. We now quote these findings and conclusions at length, given that Hancock ignores them in reasserting many of the same arguments:

> The defense claims [counsel] was deficient for failing to adequately investigate the existing medical evidence, and to confer sooner with Dr. Stier. Defense also claims [counsel] failed to take reasonable steps to secure the time necessary to investigate the case and retain experts, and failed to retain necessary experts in a timely fashion.
>
> The court disagrees with all of these assertions. First, [counsel] did question Dr. Stier at trial thoroughly, and reaffirmed his opinion there was no skull fracture. That was the best he could expect from Dr. Stier, who did not change any of his views on this case until years later.
>
> Second, it is incorrect that [counsel] failed to retain necessary experts. [Counsel] did, in fact, obtain several experts, and had them review all relevant materials. Dr. Nichols had provided testimony helpful to the defense in a similar case. He ultimately provided a report that was not helpful to the defense in this case. [Counsel] is not faulted by this court for obtaining an opinion from a well-regarded expert, Dr. Nichols, which Dr. Nichols believed to be the truth. [Counsel] had to work with the facts the case presented.
>
> [Counsel] then turned to another expert, Dr. Uscinski, who offered a different theory. [Counsel]

believed the pieces of evidence presented by Dr. Uscinski seemed to fit very well together, presenting the defense with a reasonable hypothesis. [Counsel] made the choice to proceed with Dr. Uscinski. [Counsel] presented a valid two-pronged defense to the jury, with the testimony of the defendant herself and Dr. Uscinski. This was not deficient performance, rather it was a strategic approach. "[C]ounsel's strategic choices, made after thorough investigation of the law and facts, are virtually unchallengeable."

The defense does not point out what other expert [counsel] could have actually obtained at trial other than Dr. Uscinski, even if given more time. He already knew what Dr. Nichols had to say, which was essentially to agree with the State that there was evidence of abuse. The court cannot speculate about who else [counsel] could have secured to testify any differently. [Counsel] decided to go with Dr. Uscinski, opting not to seek a continuance. That was a strategic decision this court does not criticize.

When [counsel] told the State he was having trouble securing an expert, he obviously did not admit he had actually obtained an expert opinion from a highly regard[ed] doctor which would have been fatal to the defense. Instead, he strategically, in this court's opinion, took the blame for any delay upon himself and secured another expert, Dr. Uscinski. His decision to go with what he had at that point, was directed by his reasonably informed strategic opinion at the time. The defense offered at trial by [counsel] introduced a different theory. The fact that it was not successful, is not proof of defective performance. The court does not second guess today what [counsel] did in 2009 based on this record.

The defense also claims [counsel] was deficient for failing to adequately prepare Dr. Uscinski. The defendant asserts that the failure to include in his report Dr. Uscinski's experience in radiology, led to the court not allowing Dr. Uscinski's testimony about the skull fracture. This is correct, but only technically. Despite [the trial court's] ruling that Dr. Uscinski was not qualified to testify about the skull fracture, the jury heard Dr. Uscinski testify that any post-birth injury that caused the bleeding would have been physically obvious because L.[]'s skull would have been caved in. Dr. Uscinski testified that there would have been external signs of trauma like the occipital bone being flattened or concave. "It would be of the nature of getting hit with a pipe or a baseball bat and that would be

> obvious." Whether he called these injuries a skull fracture
> or not, Dr. Uscinski made his point.

(Citations omitted.)

¶81 Rather than addressing the circuit court's findings, or arguing that these findings were clearly erroneous, Hancock ignores them and simply reargues—now in the context of an interest of justice claim—the same grounds for her ineffective assistance claim that the circuit court rejected. The circuit court's findings of fact are not clearly erroneous, and based on our independent review, we agree with the circuit court's conclusions of law regarding purported errors of counsel. To summarize, "[t]his court's power of discretionary reversal does not allow a defendant to obtain a new trial in an attempt to present a different defense theory years after the one presented by competent counsel failed to persuade the jury." *State v. Maloney*, 2006 WI 15, ¶37, 288 Wis. 2d 551, 709 N.W.2d 436.

¶82 Accordingly, on this record, we cannot conclude that reversal in the interest of justice is warranted on the basis of trial counsel's alleged inadequacies, particularly where that ineffectiveness claim itself has not been squarely presented.

¶83 In addition to asserting trial counsel's alleged inadequacies as a basis for discretionary reversal, Hancock also argues that a new trial should be granted in the interest of justice because the jury did not hear evidence related to Stier's revised opinion and "the additional medical developments in the twelve years since."

¶84 As to the impact of Stier's revised cause-of-death opinion, we conclude, for the reasons discussed above, that this testimony is largely consistent with the trial testimony. To the extent Stier's revised opinion differs from his trial

testimony, it is neither so wholly different nor so impactful in its own right that it can be said that the real controversy was not fully tried.

¶85    Regarding the allegedly new medical developments bearing on L.'s injuries and cause of death, we note that Hancock introduced postconviction testimony and other evidence on these points, and the State introduced its own testimony and other evidence to refute the defense's evidence.  After hearing all of the evidence, the circuit court concluded that the testimony presented by Hancock's postconviction hearing experts was not credible or was already considered at trial.  The court further found that "the origins of all the proposed theories [in the medical literature introduced at the postconviction hearing] predate the time of trial, and relate to disputed issues raised at trial."  The court additionally found that the testimony of the State's postconviction witnesses was "credible" and largely "consistent with the trial testimony of the State's medical experts."

¶86    On appeal, Hancock does not engage with or challenge the circuit court's factual findings on these points.  She points to portions of the postconviction hearing allegedly supporting her position, but without addressing this evidence in context.  For example, she relies on her own postconviction evidence to suggest that an acute bilateral subdural hematoma may have a nonabusive cause, including a heart virus or re-bleeding of a chronic subdural hematoma; that L.'s bucket-handle fracture may not actually have been a fracture but could be "healing rickets;" and that if L. had a bucket-handle fracture, the fracture could have been caused by attempts to insert an intraosseous line into the bone of his leg.

¶87　In making these arguments, however, Hancock cherry-picks from her own postconviction expert testimony and medical literature while ignoring challenges made to that evidence during cross-examination and the State's trial and postconviction evidence contradicting her evidence. She also fails to engage with the circuit court's factual findings on the deficiencies in her experts' testimony. Upon our own review of the postconviction hearing and trial evidence, and taking into account the deference due to the circuit court's factual findings, we are not persuaded that this is one of the exceptional cases in which the real controversy—the cause of L.'s death—was not fully tried, or that justice has miscarried. Accordingly, we conclude that discretionary reversal is not warranted.

## CONCLUSION

¶88　For the foregoing reasons, we affirm the circuit court order denying Hancock's WIS. STAT. § 974.06 motion for a new trial.[21]

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[21] Following the completion of briefing in this case, Hancock submitted supplemental authorities pursuant to WIS. STAT. § 809.19(10)—specifically, a decision from a New Jersey trial judge in which the judge barred expert testimony concerning "Shaken Baby Syndrome/Abusive Head Trauma," and information indicating that Dr. Knox, previously discussed in footnote 11 of this opinion, was forced to resign from her position as a medical director of a child abuse forensic clinic in Alaska. The State filed a response to Hancock's supplemental authorities and Hancock filed a reply. We have considered these supplemental authorities, the State's response, and Hancock's reply, and determine that these authorities do not affect our conclusions in this case.